14-1823 (L)

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2015

(Argued: December 1, 2015    Decided: January 18, 2017)

Docket Nos. 14-1823, 14-1909, 14-1991, 14-1997, 14-2003

———————————

Catskill Mountains Chapter of Trout Unlimited, Inc., Theodore Gordon Flyfishers, Inc., Catskill-Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc., Riverkeeper, Inc., Waterkeeper Alliance, Inc., Trout Unlimited, Inc., National Wildlife Federation, Environment America, Environment New Hampshire, Environment Rhode Island, Environment Florida, State of New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, Washington,
*Plaintiffs-Appellees*,

Government of the Province of Manitoba, Canada,
*Consolidated Plaintiff-Appellee*,

Miccosukee Tribe of Indians of Florida, Friends of the Everglades, Florida Wildlife Federation, Sierra Club,
*Intervenor Plaintiffs-Appellees*,

v.

United States Environmental Protection Agency, Gina McCarthy, in her official capacity as Administrator of the United States Environmental Protection Agency,
*Defendants-Appellants-Cross Appellees*,

State of Colorado, State of New Mexico, State of Alaska, Arizona Department of Water Resources, State of Idaho, State of Nebraska, State of North Dakota, State of Nevada, State of Texas, State of Utah, State of Wyoming, Central Arizona Water Conservation District, Central Utah Water Conservancy District, City and County of Denver, by and through its Board of Water Commissioners, City and

County of San Francisco Public Utilities Commission, City of Boulder [Colorado], City of Aurora [Colorado], El Dorado Irrigation District, Idaho Water Users Association, Imperial Irrigation District, Kane County [Utah] Water Conservancy District, Las Vegas Valley Water District, Lower Arkansas Valley Water Conservancy District, Metropolitan Water District of Southern California, National Water Resources Association, Salt Lake & Sandy [Utah] Metropolitan Water District, Salt River Project, San Diego County Water Authority, Southeastern Colorado Water Conservancy District, The City of Colorado Springs, acting by and through its enterprise Colorado Springs Utilities, Washington County [Utah] Water District, Western Urban Water Coalition, [California] State Water Contractors, City of New York,
*Intervenor Defendants-Appellants-Cross Appellees*,

Northern Colorado Water Conservancy District,
*Intervenor Defendant*,

v.

South Florida Water Management District,
*Intervenor Defendant-Appellant-Cross Appellant*.

_____

Before:     SACK, CHIN, and CARNEY, *Circuit Judges*.

In 2008, the United States Environmental Protection Agency promulgated the "Water Transfers Rule," which formalized the Agency's longstanding position that water transfers are not subject to regulation under the National Pollutant Discharge Elimination System permitting program established decades ago by the Clean Water Act. Shortly thereafter, the plaintiffs, a consortium of environmental conservation and sporting organizations and several state, provincial, and tribal governments, challenged the Water Transfers Rule by

bringing suit in the United States District Court for the Southern District of New York against the Agency and its Administrator. After a variety of persons and entities on both sides of the issue intervened, the district court (Kenneth M. Karas, *Judge*) granted summary judgment for the plaintiffs on the ground that the Water Transfers Rule, although entitled to deferential review under the two-step framework established by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), could not survive judicial scrutiny because it was based on an unreasonable interpretation of the Clean Water Act. The district court accordingly vacated the Water Transfers Rule and remanded it to the Agency for further assessment. We conclude that the Water Transfers Rule is based on a reasonable interpretation of the Clean Water Act and therefore entitled to *Chevron* deference. Accordingly, the judgment of the district court is

REVERSED.

Judge Chin dissents in a separate opinion.

BARBARA D. UNDERWOOD, Solicitor General (Steven C. Wu, Deputy Solicitor General; Judith N. Vale, Assistant Solicitor General; Lemuel Srolovic, Bureau Chief; Philip Bein, Watershed Inspector General; Meredith Lee-Clark, Assistant Attorney General, Environmental Protection Bureau,

*on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, New York, New York, *for Plaintiffs-Appellees the States of New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, and Washington, and the Province of Manitoba.*

Daniel E. Estrin, Karl S. Coplan, Pace Environmental Litigation Clinic, Inc., White Plains, New York, *(on the brief), for Plaintiffs-Appellees Catskill Mountains Chapter of Trout Unlimited, Inc., Theodore Gordon Flyfishers, Inc., Catskill-Delaware Natural Water Alliance, Inc., Federated Sportsmen's Clubs of Ulster County, Inc., Riverkeeper, Inc., Waterkeeper Alliance, Inc., Trout Unlimited, Inc., National Wildlife Federation, Environment America, Environment New Hampshire, Environment Rhode Island, and Environment Florida.*

Yinet Pino, Miccosukee Tribe of Indians of Florida, Miami, Florida; David G. Guest, Earthjustice, Tallahassee, Florida, *(on the brief), for Intervenor Plaintiffs-Appellees Miccosukee Tribe of Indians of Florida, Friends of the Everglades, Florida Wildlife Federation, and Sierra Club.*

ROBERT WILLIAM YALEN (Benjamin H. Torrance, *on the briefs*), *for* Preet Bharara, United States Attorney for the Southern District of New York, *for Defendants-Appellants United States Environmental Protection Agency and Gina McCarthy.*

PETER D. NICHOLS, Berg Hill Greenleaf & Ruscitti LLP, Boulder, Colorado (Don Baur

& Paul Smyth, Perkins Coie LLP, Washington, District of Columbia, *on the brief*), *for Intervenor Defendants-Appellants-Cross Appellees Central Arizona Water Conservation District, Central Utah Water Conservancy District, City and County of Denver, by and through its Board of Water Commissioners, City and County of San Francisco Public Utilities Commission, City of Boulder [Colorado], City of Aurora [Colorado], El Dorado Irrigation District, Idaho Water Users Association, Imperial Irrigation District, Kane County [Utah] Water Conservancy District, Las Vegas Valley Water District, Lower Arkansas Valley Water Conservancy District, The Metropolitan Water District of Southern California, National Water Resources Association, Salt Lake & Sandy [Utah] Metropolitan Water District, Salt River Project, San Diego County Water Authority, Southeastern Colorado Water Conservancy District, The City of Colorado Springs, Acting by and through its Enterprise Colorado Springs Utilities, Washington County [Utah] Water District, Western Urban Water Coalition, and [California] State Water Contractors.*[1]

JULIE STEINER (Larry Sonnenshein & Hilary Meltzer, *on the briefs*), *for Zachary W. Carter, Corporation Counsel of the City of New York, New York, New York, for Intervenor Defendant-Appellant-Cross Appellee City of New York.*

---

[1] Peter D. Nichols also appeared at oral argument on behalf of Intervenor-Defendants-Appellants-Cross Appellees States of Colorado, New Mexico, Alaska, Arizona (Department of Water Resources), Idaho, Nebraska, Nevada, North Dakota, Texas, Utah, and Wyoming.

JAMES EDWARD NUTT, South Florida Water Management District, West Palm Beach, Florida, *for Intervenor Defendant-Appellant-Cross-Appellant South Florida Water Management District.*

Annette M. Quill, Senior Assistant Attorney General, State of Colorado, Denver, Colorado, *(on the briefs)*, *for Intervenor-Defendants-Appellants-Cross Appellees States of Colorado, New Mexico, Alaska, Arizona (Department of Water Resources), Idaho, Nebraska, Nevada, North Dakota, Texas, Utah, and Wyoming.*

Ellen B. Steen, Danielle Hallcom Quist, American Farm Bureau Federation, Washington, District of Columbia; Staci Braswell, Florida Farm Bureau Federation, Gainesville, Florida; Timothy S. Bishop, Michael B. Kimberly, Mayer Brown LLP, Washington, District of Columbia, *(on the brief)*, *for Amici Curiae—American Farm Bureau Federation and Florida Farm Bureau Federation.*

Laura Murphy & Patrick Parenteau, Environmental & Natural Resources Law Clinic, Vermont Law School, South Royalton, Vermont, (*on the brief*), *for Amici Curiae—Leon G. Billings, Tom Jorling, Jeffrey G. Miller, Robert W. Adler, William Andreen, Harrison C. Dunning, Mark Squillace, and Sandra B. Zellmer.*

Kamala D. Harris, Attorney General; Robert W. Byrne, Senior Assistant Attorney General; Gavin G. McCabe, Supervising Deputy Attorney General; William Jenkins,

Deputy Attorney General; State of California Department of Justice, Office of the Attorney General, San Francisco, California, *(on the brief), for Amicus Curiae— State of California by and through the California Department of Water Resources.*

Michael A. Swiger, Charles R. Sensiba, Sharon L. White, Van Ness Feldman, LLP, Washington, District of Columbia, (*on the brief), for Amici Curiae—National Hydropower Association, Northwest Hydroelectric Association, American Public Power Association, Sabine River Authority of Texas, Sabine River Authority State of Louisiana, and Oglethorpe Power Corporation.*

SACK, *Circuit Judge*:

> "Water, water, everywhere / Nor any drop to drink."[2]

Because New York City cannot tap the rivers, bays, and ocean that inhabit, surround, or, on occasion, inundate it to slake the thirst of its many millions of residents, it must instead draw water primarily from remote areas north of the City, mainly the Catskill Mountain/Delaware River watershed west of the Hudson River, and the Croton Watershed east of the Hudson River and closer to

---

[2] Samuel Taylor Coleridge, *The Rime of the Ancient Mariner* pt. II, st. 9 (1798) (as many high school students likely already know).

New York City.[3]  Water is drawn from the Schoharie Reservoir[4] through the eighteen-mile-long Shandaken Tunnel into the Esopus Creek.  The Creek's water, in turn, flows into another reservoir, then through an aqueduct, and then through several more reservoirs and tunnels alongside the Hudson River, having crossed the River to its Eastern shore some 50 miles north of New York City.  Eventually, it arrives at its final destination: the many taps, faucets, and the like within the City's five boroughs.

The movement of water from the Schoharie Reservoir through the Shandaken Tunnel into the Esopus Creek is what is known as a "water transfer," an activity that conveys or connects waters of the United States without subjecting those waters to any intervening industrial, municipal, or commercial use.  Water transfers are an integral part of America's water-supply infrastructure, of which the Schoharie Reservoir system is but a very small part.

---

[3]  For a New York State Department of Environmental Conservation map of the system, *see* New York City's Water Supply System, N.Y.C. Dep't of Envtl. Prot., http://www.dec.ny.gov/docs/water_pdf/nycsystem.pdf (last visited July 18, 2016), *archived at* https://perma.cc/JG4J-FP3E.

[4] The reservoir is "roughly 110 miles from New York City. . . .  [It] is one of two reservoirs in the City's Catskill system, and the northernmost reservoir in the entire [New York City] Water Supply System."  *Schoharie*, N.Y.C. Dep't of Envtl. Prot., http://www.nyc.gov/html/dep/html/watershed_protection/schoharie.shtml (last visited July 18, 2016), *archived at* https://perma.cc/ZPV4-EPCZ.

Each year, thousands of water transfers are employed in the course of bringing water to homes, farms, and factories not only in the occasionally rain-soaked Eastern, Southern, and Middle- and North-Western portions of the country, but also in the arid West (including large portions of the Southwest). Usable bodies of water in the West tend to be scarce, and most precipitation there falls as snow, often in sparsely populated areas at considerable distance from their water authorities' urban and agricultural clientele.

Historically, the United States Environmental Protection Agency (the "EPA") has taken a hands-off approach to water transfers, choosing not to subject them to the requirements of the National Pollutant Discharge Elimination System ("NPDES") permitting program established by the Clean Water Act in 1972. Some have criticized the EPA for this approach. They argue that like ballast water in ships,[5] water transfers can move harmful pollutants from one body of water to another, potentially putting local ecosystems, economies, and public health at risk. While acknowledging these concerns, the EPA has held fast to its position. Indeed, following many lawsuits seeking to establish whether NPDES permits are required for water transfers, the EPA formalized its stance in 2008—

---

[5] *See generally Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 561-62 (2d Cir. 2015).

more than three decades after the passage of the Clean Water Act—in a rule known as the "Water Transfers Rule."

Shortly thereafter, several environmentalist organizations and state, provincial, and tribal governments challenged the Rule by bringing suit against the EPA and its Administrator in the United States District Court for the Southern District of New York. After many entities—governmental, tribal, and private—intervened on either side of the case, the district court (Kenneth M. Karas, *Judge*) granted summary judgment for the plaintiffs, vacating the Rule and remanding the matter to the EPA. In a thorough, closely reasoned, and detailed opinion, the district court concluded that although *Chevron* deference is applicable and requires the courts to defer to the EPA and uphold the Rule if it is reasonable, the Rule represented an unreasonable interpretation of the Clean Water Act, and was therefore invalid under the deferential two-step framework for judicial review established in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The court held that the Rule was contrary to the requirements established by the Act.

The Federal Government and the intervenor-defendants timely appealed. Despite the district court's herculean efforts and its careful and exhaustive

explanation for the result it reached, we now reverse for the reasons set forth below.

At step one of the *Chevron* analysis, we conclude—as did the district court—that the Clean Water Act does not speak directly to the precise question of whether NPDES permits are required for water transfers, and that it is therefore necessary to proceed to *Chevron*'s second step. At step two of the *Chevron* analysis, we conclude—contrary to the district court—that the Water Transfers Rule's interpretation of the Clean Water Act is reasonable. We view the EPA's promulgation of the Water Transfers Rule here as precisely the sort of policymaking decision that the Supreme Court designed the *Chevron* framework to insulate from judicial second- (or third-) guessing. It may well be that, as the plaintiffs argue, the Water Transfers Rule's interpretation of the Clean Water Act is not the interpretation best designed to achieve the Act's overall goal of restoring and protecting the quality of the nation's waters. But it is nonetheless an interpretation supported by valid considerations: The Act does not require that water quality be improved whatever the cost or means, and the Rule preserves state authority over many aspects of water regulation, gives regulators flexibility to balance the need to improve water quality with the potentially high

costs of compliance with an NPDES permitting program, and allows for several alternative means for regulating water transfers. While we might prefer an interpretation more consistent with what appear to us to be the most prominent goals of the Clean Water Act, *Chevron* tells us that so long as the agency's statutory interpretation is reasonable, what we might prefer is irrelevant.

# BACKGROUND[6]

## *The Clean Water Act and the National Pollutant Discharge Elimination System ("NPDES") Permitting Program*

In 1972, following several events such as the 1969 "burning" of the

Cuyahoga River in Cleveland, Ohio[7] that increased national concern about

---

[6] The parties and *amici* (we use the abbreviations here that we adopt for the remainder of this opinion) have filed sixteen briefs taking opposing positions on the validity of the Water Transfers Rule, as follows:

- Anti-Water Transfers Rule:
  - The States of New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, and Washington, and the Province of Manitoba (collectively, the "Anti-Rule States").
  - Leon G. Billings *et al.*
  - The Miccosukee Tribe of Indians of Florida *et al.*
  - Catskill Mountains Chapter of Trout Unlimited, Inc. *et al.* (collectively, the "Sportsmen and Environmental Organization Plaintiffs").
- Pro-Water Transfers Rule:
  - The State of California.
  - The United States Environmental Protection Agency and Gina McCarthy (collectively, the "EPA").
  - The American Farm Bureau Federation and Florida Farm Bureau Federation (collectively, the "Farmer *Amici*").
  - National Hydropower Association *et al.* (collectively, the "Hydropower *Amici*").
  - The City of New York ("NYC").
  - South Florida Water Management District.
  - Central Arizona Water Conservation District *et al.* (the "Water Districts").
  - The States of Colorado, New Mexico, Alaska, Arizona (Department of Water Resources), Idaho, Nebraska, Nevada, North Dakota, Texas, Utah, and Wyoming (the "Western States," and, together with the Water Districts, the "Western Parties").

pollution of our nation's waters, Congress enacted the Federal Water Pollution Control Act ("FWPCA") Amendments of 1972, 86 Stat. 816, *as amended*, 33 U.S.C. § 1251 *et seq.*, commonly known as the Clean Water Act (sometimes hereinafter the "Act" or the "CWA").  Congress's principal objective in passing the Act was "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  Congress also envisioned that the Act's passage would enable "the discharge of pollutants into the navigable waters [to] be eliminated by 1985."  *Id.* § 1251(a)(1).  Although time has proven this projection to have been over-optimistic at best, it is our understanding that the Act has succeeded to a significant degree in cleaning up our nation's waters.

The Act "prohibits 'the discharge of any pollutant by any person' unless done in compliance with some provision of the Act."  *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 102 ("*Miccosukee*") (quoting 33 U.S.C. § 1311(a)).  The statute defines the discharge of a pollutant as "any addition of any pollutant to navigable waters from any point source,"[8] 33 U.S.C. § 1362(12)(A), where

---

[7] *See, e.g.*, Michael Rotman, *Cuyahoga River Fire*, Cleveland Historical, *http://clevelandhistorical.org/items/show/63#.V0XS7eRcjRs* (last visited July 18, 2016), *archived at* https://perma.cc/5VVP-TTAY.

[8] A "point source" is "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft,

"navigable waters" means "the waters of the United States, including the territorial seas," *id.* § 1362(7). The principal provision under which such a discharge may be allowed is Section 402, which establishes the "National Pollutant Discharge Elimination System" ("NPDES") permitting program. 33 U.S.C. § 1342. With narrow exceptions not relevant here, a party must acquire an NPDES permit in order to discharge a specified amount of a specified pollutant. *See id.*; *Miccosukee*, 541 U.S. at 102. Thus, without an NPDES permit, it is unlawful for a party to discharge a pollutant into the nation's navigable waters.

"[B]y setting forth technology-based effluent limitations and, in certain cases, additional water quality based effluent limitations[, ]the NPDES permit 'defines, and facilitates compliance with, and enforcement of, a preponderance of a discharger's obligations under the [Act].'" *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 492 (2d Cir. 2005) (third brackets in original) (quoting *EPA v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976)). Noncompliance with an NPDES permit's conditions is a violation of the Clean Water Act. 33 U.S.C. § 1342(h). Once an NPDES permit has been issued, the EPA, states, and citizens can bring suit in federal court to enforce it. *See id.* §§ 1319(a)(3), 1365(a).

---

from which pollutants are or may be discharged," other than in the case of "agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14).

The Act envisions "cooperative federalism" in the management of the nation's water resources. *See, e.g.*, *New York v. United States*, 505 U.S. 144, 167 (1992) (referring to the Act as an example of "cooperative federalism"); *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992) (the Act "anticipates a partnership between the States and the Federal Government"). Reflecting that approach, states typically control the NPDES permitting programs as they apply to waters within their borders, subject to EPA approval. *See* 33 U.S.C. §§ 1314(i)(2), 1342(b)-(c).[9] The Act also preserves states' "primary responsibilities and rights" to abate pollution, *id.* § 1251(b), including their traditional prerogatives to "plan the development and use (including restoration, preservation, and enhancement) of . . . water resources," *id.*, and to "allocate quantities of water within [their] jurisdiction," *id*. § 1251(g),[10] subject to the federal floor on environmental

---

[9] The EPA has authorized forty-six states and the U.S. Virgin Islands to implement the NPDES program. *NPDES State Program Information*, EPA, https://www.epa.gov/npdes/npdes-state-program-information (last updated Feb. 19, 2016; last visited July 18, 2016), *archived at* https://perma.cc/7M4V-469F.

[10] The Act's statement regarding the preservation of states' water-allocation authority was added by the Clean Water Act of 1977, also known as the "1977 Amendments" to the Act. *See* Pub L. No. 95-217, § 5(a), 91 Stat. 1566, 1567 (codified as amended at 33 U.S.C. § 1251(g)).

protection set by the Act and regulations promulgated thereunder by the EPA, *see Nat. Res. Def. Council v. EPA*, 808 F.3d 556, 580 (2d Cir. 2015).

### *Water Transfers and the Water Transfers Rule*[11]

According to EPA regulations, a "water transfer" is "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use." 40 C.F.R. § 122.3(i). Water transfers take a variety of forms. A transfer may be accomplished, for example, through artificial tunnels and channels, or natural streams and water bodies; and through active pumping or passive direction. There are thousands of water transfers currently in place in the United States, including at least sixteen major diversion projects west of the Mississippi River. Many of the largest U.S. cities draw on water transfers to bring drinkable water to their residents. The City of New York's "water supply system . . . relies on transfers of water among its [nineteen] collecting reservoirs. The City provides approximately 1.2 billion gallons of . . . water a day to nine million people— nearly half of the population of New York State." Letter Dated August 7, 2006,

---

[11] In this section, we refer to the contents of various documents supplied by the parties and *amici*. This information was not admitted into evidence in any judicial proceeding. We think, though, that it is at least plausible, and that even when treated as part of the argument, it supplies a general picture of the factual background of this appeal against which our legal conclusions may better be understood.

from Mark D. Hoffer, General Counsel, City of New York Department of Environmental Protection to EPA, at 1, J.A. at 331.

The parties and *amici* tell us that water transfers are of special significance in the Western United States.  Because much precipitation in the West falls as snow, water authorities there must capture water when and where the snow falls and melts, typically in remote and sparsely populated areas, and then transport it to agricultural and urban sites where it is most needed.  *See* Western States Br. 1-2; *see also* State of California *Amicus* Br. 16 n.5.  Colorado, for example, engages in over forty interbasin diversions in order to serve the State's water needs.  *See* Letter Dated  July 17, 2006, from Brian N. Nazarenus, Chair, Colorado Water Quality Control Commission, to Water Docket, EPA, at 1, J.A. at 320.  California uses the "California State Water Project," a complex water delivery system based on interbasin transfers from Northern California to Southern California, to serve the water needs of 25 million of its 37 million residents.  *See* State of California *Amicus* Br. 3-10.  Water transfers are also obviously crucial to agriculture, conveying water to enormously important farming regions such as the Central and Imperial Valleys of California, Weld and Larimer Counties in Colorado, the

Snake River Valley of Idaho, and the Yakima Valley of Washington. *See* Water Districts Br. 16-19.

At the same time, though, water transfers, like ballast water in ships, *see generally Nat. Res. Def. Council*, 808 F.3d at 561-62, can move pollutants from one body of water to another, potentially endangering ecosystems, portions of the economy, and public health near the receiving water body—and possibly beyond. Despite these risks, for many years the EPA has taken a passive approach to regulating water transfers, effectively exempting them from the NPDES permitting system. The States have also generally adopted a hands-off policy.[12]

During the 1990s and 2000s, prior to its codification in the Water Transfers Rule, the EPA's position was challenged by, among others, environmentalist groups, which filed several successful lawsuits asserting that NPDES permits were required for some specified water transfers. *See, e.g., Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77 (2d Cir. 2006) ("*Catskill II*"), *cert. denied*, 549 U.S. 1252 (2007); *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155 (9th Cir.), *cert. denied*, 124 S. Ct. 434 (2003); *Catskill*

---

[12] Pennsylvania is the only NPDES permitting authority that regularly issues NPDES permits for water transfers. *See* Water Transfers Rule, 73 Fed. Reg. at 33,699 pt. II.

*Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2d Cir. 2001) ("*Catskill I*"); *see also Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273 (1st Cir. 1996), *cert. denied sub nom. Loon Mountain Recreation Corp. v. Dubois*, 521 U.S. 1119 (1997). None of these decisions classified the EPA's views on the regulation of water transfers as sufficiently formal to warrant *Chevron* deference. *See, e.g.*, *Catskill II*, 451 F.3d at 82 (declining to apply *Chevron* deference framework); *Catskill I*, 273 F.3d at 491 (same).

In response, the EPA took steps to formalize its position. In August 2005, the EPA's Office of General Counsel and Office of Water issued a legal memorandum written by then-EPA General Counsel Ann R. Klee (the "Klee Memorandum") that argued that Congress did not intend for water transfers to be subject to the NPDES permitting program. The EPA proposed a formal rule incorporating this interpretation on June 7, 2006, 71 Fed. Reg. 32,887, and then, following notice-and-comment rulemaking proceedings, on June 13, 2008, adopted a final rule entitled "National Pollutant Discharge Elimination System (NPDES) Water Transfers Rule" (the "Water Transfers Rule"), 73 Fed. Reg. 33,697-708 (June 13, 2008) (codified at 40 C.F.R. § 122.3(i)).

The Water Transfers Rule's summary states:

EPA is issuing a regulation to clarify that water transfers are not subject to regulation under the National Pollutant Discharge Elimination System (NPDES) permitting program. This rule defines water transfers as an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use. This rule focuses exclusively on water transfers and does not affect any other activity that may be subject to NPDES permitting requirements.

*Id.* at 33,697.

The Rule states that water transfers "do not require NPDES permits because they do not result in the 'addition' of a pollutant."[13] *Id.* at 33,699.  No NPDES permit is required if "the water being conveyed [is] a water of the U.S. prior to being discharged to the receiving waterbody" and the water is transferred "from one water of the U.S. to another water of the U.S."[14] *Id.*

---

[13] The Rule added a new subsection to 40 C.F.R. § 122.3, which lists the pollutant discharges that are exempted from NPDES permitting.  The new subsection provides:

> Discharges from a water transfer.  Water transfer means an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use.  This exclusion does not apply to pollutants introduced by the water transfer activity itself to the water being transferred.

40 C.F.R. § 122.3(i).

[14] "Waters of the U.S." are defined for purposes of the NPDES program in 40 C.F.R. § 122.2, but without addressing what precisely is within the scope of the term, Water Transfers Rule, 73 Fed. Reg. at 33,699 n.2.  In 2015, the EPA and the U.S. Army Corps of Engineers adopted a new rule modifying the definition of "waters of the United States." Clean Water Rule: Definition of "Waters of the United States," 80 Fed. Reg. 37,054,

(footnote omitted).  Thus, even if a water transfer conveys waters in which pollutants are present, it does not result in an "addition" to "the waters of the United States," because the pollutant is already present in "the waters of the United States."  Under the EPA's view, an "addition" of a pollutant under the Act occurs only "when pollutants are introduced from outside the waters being transferred."  *Id.* at 33,701.  On appeal—but not in the Water Transfers Rule itself—the EPA characterizes this interpretation of Section 402 of the Clean Water Act as embracing what is often referred to as the "unitary-waters" reading of the statutory language, *see* EPA Br. 15-16, 54, which we will discuss further below.

In the Water Transfers Rule, the EPA justified its interpretation of the Act in an explanation spanning nearly four pages of the Federal Register, touching on the text of Section 402, the structure of the Act, and pertinent legislative history.  *See* Water Transfers Rule, 73 Fed. Reg. at 33,700-03.  The EPA explained that its "holistic approach to the text" of the statute was "needed here in particular because the heart of this matter is the balance Congress created

37,055-37,056 (June 29, 2015).  "That rule is currently stayed nationwide, pending resolution of claims that the rule is arbitrary, capricious, and contrary to law."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1812 n.1 (2016) (citing *In re EPA*, 803 F.3d 804, 807-09 (6th Cir. 2015)).  Regardless of how expansively the term is interpreted, we would still be faced with the question of whether the EPA could permissibly exempt from NPDES permitting the transfer of water from one "water of the U.S." to another "water of the U.S."

between federal and State oversight of activities affecting the nation's waters."

*Id.* at 33,701. The agency also responded to a wide variety of public comments on the proposed Rule. *See id.* at 33,703-06.

### *District Court Proceedings*

On June 20, 2008, a group of environmental conservation and sporting organizations filed a complaint against the EPA and its Administrator (then Stephen L. Johnson, now Gina McCarthy) in the United States District Court for the Southern District of New York. The States of New York, Connecticut, Delaware, Illinois, Maine, Michigan, Minnesota, Missouri, and Washington, and the Province of Manitoba, Canada (collectively, the "Anti-Rule States") did the same on October 2, 2008. In their complaints, the plaintiffs requested that the district court hold unlawful and set aside the Water Transfers Rule pursuant to Section 706(2) of the Administrative Procedure Act (the "APA"), 5 U.S.C. § 706(2).[15] In October 2008, the district court consolidated the two cases and granted a motion by the City of New York to intervene in support of the defendants.

---

[15] The Anti-Rule States also sought a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

At about the same time these actions were filed, five parallel petitions for review of the Water Transfers Rule were filed in the First, Second, and Eleventh Circuits. On July 22, 2008, the United States Judicial Panel on Multidistrict Litigation consolidated these petitions and randomly assigned them to the Eleventh Circuit. The Eleventh Circuit then consolidated a sixth petition for review, and stayed all of these petitions pending its disposition of *Friends of the Everglades v. South Florida Water Management District*, No. 07-13829-HH (11th Cir.) ("*Friends I*"), a separate but conceptually related case. The district court in the case now before us granted the EPA's motion to stay the proceedings pending the Eleventh Circuit's resolution of *Friends I* and the six consolidated petitions. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 630 F. Supp. 2d 295, 307 (S.D.N.Y. 2009). In June 2009, the Eleventh Circuit issued a decision in *Friends I*, 570 F.3d 1210 (11th Cir. 2009), *reh'g en banc denied*, 605 F.3d 962 (2010), *cert. denied*, 562 U.S. 1082, *and cert. denied sub nom. Miccosukee Tribe v. S. Fla. Water Mgmt. Dist.*, 562 U.S. 1082 (2010), according *Chevron* deference to, and upholding, the Water Transfers Rule. *Id*. at 1227-28. Then, on October 26, 2012, the Circuit issued a decision dismissing the six consolidated petitions for lack of subject-matter jurisdiction under 33 U.S.C. § 1369(b)(1). *Friends of the Everglades v. EPA*,

699 F.3d 1280, 1286, 1289 (11th Cir. 2012) ("*Friends II*"), *cert. denied*, 134 S. Ct. 421, *and cert. denied sub nom. U.S. Sugar Corp. v. Friends of the Everglades*, 134 S. Ct. 422, *and cert. denied sub nom. S. Fla. Water Mgmt. Dist. v. Friends of the Everglades*, 134 S. Ct. 422 (2013).  The district court in the case at bar lifted the stay on December 17, 2012, the date the Eleventh Circuit's mandate in *Friends II* was issued.

On January 30, 2013, the district court granted multiple applications on consent to intervene as plaintiffs and defendants under Federal Rule of Civil Procedure 24.  This added as intervenor-plaintiffs the Miccosukee Tribe of Indians of Florida, Friends of the Everglades, the Florida Wildlife Federation, and the Sierra Club, and as intervenor-defendants the States of Alaska, Arizona (Department of Water Resources), Colorado, Idaho, Nebraska, Nevada, New Mexico, North Dakota, Texas, Utah, and Wyoming, and various municipal water providers from Western states.  The parties filed multiple motions and cross-motions for summary judgment.

On March 28, 2014, the district court granted the plaintiffs' motions for summary judgment and denied the defendants' cross-motions.  *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 8 F. Supp. 3d 500 (S.D.N.Y. 2014).  At the first step of the *Chevron* analysis, the district court decided that the

Clean Water Act is ambiguous as to whether Congress intended the NPDES program to apply to water transfers. *Id.* at 518-32. The district court then proceeded to the second step of the *Chevron* analysis, at which it struck down the Water Transfers Rule as an unreasonable interpretation of the Act. *Id.* at 532-67.

The defendants and intervenor-defendants other than the Northern Colorado Water Conservancy District (hereinafter "the defendants") timely appealed.

## DISCUSSION

"On appeal from a grant of summary judgment in a challenge to agency action under the APA, we review the administrative record and the district court's decision *de novo*." *Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 173-74 (2d Cir. 2006). We conclude that the Water Transfers Rule is a reasonable interpretation of the Clean Water Act and is therefore entitled to *Chevron* deference. Accordingly, we reverse the judgment of the district court.

We evaluate challenges to an agency's interpretation of a statute that it administers within the two-step *Chevron* deference framework. *Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 264 (2d Cir. 2016). At *Chevron* Step One, we ask "whether Congress has directly spoken to the precise question at issue. If the

intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statutory language is "silent or ambiguous," however, we proceed to *Chevron* Step Two, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute" at issue. *Id.* at 843. If it is—i.e., if it is not "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844—we will accord deference to the agency's interpretation of the statute so long as it is supported by a reasoned explanation, and "so long as the construction is 'a reasonable policy choice for the agency to make,'" *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 986 (2005) ("*Brand X*") (quoting *Chevron*, 467 U.S. at 845).

This framework has been fashioned as a means for the proper resolution of administrative-law disputes that involve all three branches of the Federal Government, seriatim.

First, the Legislative Branch, Congress, passes a bill that reflects its judgment on the issue—in the case before us, the Clean Water Act. After the head of the Executive Branch, the President, signs that bill, it becomes the law of the land.

27

Second, the Executive Branch, if given the authority to do so by legislation, may address the issue through its authorized administrative agency or agencies, typically although not necessarily by regulation—in this case the EPA through its Water Transfer Rule. In doing so, the executive agency must defer to the Legislative Branch by following the law or laws that it has enacted and that cover the matter.

Only last, in case of a challenge to the Legislative Branch's authority to pass the law, or to the Executive Branch's authority to administer it in the manner that it has chosen to adopt, may we in the Judicial Branch become involved in the process. When we do so, though, we are not only last, we are least: We must defer both to the Legislative Branch by refraining from reviewing Congress's legislative work beyond determining what the statute at issue means and whether it is constitutional, and to the Executive Branch by using the various principles of deference, including *Chevron* deference, which we conclude is applicable in the case at bar. For us to decide for ourselves what in fact is the preferable route for addressing the substantive problem at hand would be directly contrary to this constitutional scheme. What we may think to be the best

or wisest resolution of problems of water transfers and pollution emphatically does not matter.

Abiding by this constitutional scheme, we begin at *Chevron* Step One. We conclude, as did the district court, that Congress did not in the Clean Water Act clearly and unambiguously speak to the precise question of whether NPDES permits are required for water transfers.  It is therefore necessary to proceed to *Chevron* Step Two, under which we conclude that the EPA's interpretation of the Act in the Water Transfers Rule represents a reasonable policy choice to which we must defer.  The question is whether the Clean Water Act can support the EPA's interpretation, taking into account the full panoply of interpretive considerations advanced by the parties.  Ultimately, we conclude that the Water Transfers Rule satisfies *Chevron*'s deferential standard of review because it is supported by a reasoned explanation that sets forth a reasonable interpretation of the Act.

**I.    *Chevron* Step One**

At *Chevron* Step One, "the [reviewing] court must determine 'whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the

agency, must give effect to the unambiguously expressed intent of Congress.'"

*City of Arlington v. FCC*, 133 S. Ct. 1863, 1868 (2014) (quoting *Chevron*, 467 U.S. at 842-43). To determine whether a statute is ambiguous, we employ "traditional tools of statutory construction" to ascertain if "Congress had an intention on the precise question at issue" that "must be given effect." *Chevron*, 467 U.S. at 843 n.9.

The issue before us at this point, then, is whether the Act plainly requires a party to acquire an NPDES permit in order to make a water transfer. We agree with the district court that the Clean Water Act does not clearly and unambiguously speak to that question. We will begin, however, by addressing the plaintiffs' argument that we previously held otherwise in *Catskill I*, 273 F.3d 481 (2d Cir. 2001), and *Catskill II*, 451 F.3d 77 (2d Cir. 2006).

*A.* **Catskill I** *and* **Catskill II**

The plaintiffs argue that this case can be resolved at *Chevron* Step One because we held in *Catskill I* and *Catskill II* that the Clean Water Act unambiguously requires NPDES permits for water transfers. We disagree with the plaintiffs' reading of those decisions because our application there of the deference standard set forth in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), and *United States v. Mead Corp.*, 533 U.S. 218 (2001)—so-called "*Skidmore*" or

"*Skidmore/Mead*" deference—and the reasoning underlying the decisions make clear that we have not previously held that the statutory language at issue here is unambiguous, such that we cannot defer under *Chevron* to the EPA's interpretation of the Clean Water Act in the Water Transfers Rule.

In *Catskill I*, we held that that the City of New York[16] violated the Clean Water Act by transferring turbid water[17] from the Schoharie Reservoir through the Shandaken Tunnel into the Esopus Creek without an NPDES permit, because the transfer of turbid water into the Esopus Creek was an "addition" of a pollutant. 273 F.3d at 489-94. Following our remand in *Catskill I*, the district court assessed a $5,749,000 civil penalty against New York City and ordered the City to obtain a permit for the operation of the Shandaken Tunnel. The City's appeal from that ruling was resolved in *Catskill II*, in which we reaffirmed the holding of *Catskill I*. *Catskill II*, 451 F.3d at 79.

In both *Catskill I* and *Catskill II*, we applied the *Skidmore* deference standard to informal policy statements by the EPA that interpreted the same provision of

---

[16] In addition to the City of New York, the New York City Department of Environmental Protection and its Commissioner at the time, Joel A. Miele, Sr., were also defendants in *Catskill I*.

[17] Turbid water is water carrying high levels of solids in suspension. *Catskill I*, 273 F.3d at 488.

the Act at issue here not to require NPDES permits for water transfers. *See id*. at 83-84 & n.5 (noting that under *Skidmore* "[w]e . . . defer to the agency interpretation according to its 'power to persuade'" and "declin[ing] to defer to the EPA['s]" informal interpretation of the CWA as expressed in the Klee Memorandum (quoting *Mead*, 533 U.S. at 235)); *Catskill I*, 273 F.3d at 490-91 (applying *Skidmore* to the EPA's position as expressed in informal policy statements and litigation positions, and concluding that "we do not find the EPA's position to be persuasive"). *Skidmore* instructs that "the rulings, interpretations and opinions" of an agency may constitute "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore*, 323 U.S. at 140. The appropriate level of deference accorded to an agency's interpretation of a statute under the *Skidmore* standard depends on the interpretation's "power to persuade," which in turn depends on, *inter alia*, "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id*. This "approach has produced a spectrum of judicial responses, from great respect at one end, to near indifference at the other." *Mead*, 533 U.S. at 228 (internal citations omitted).[18]

---

[18] The Supreme Court's 2001 decision in *Mead* breathed new life into *Skidmore*, which as

Although the *Chevron* and *Skidmore* deference standards differ in application, they are similar in one respect:  As with *Chevron* deference, we will defer to the agency's interpretation under the *Skidmore* standard only when the statutory language at issue is ambiguous.  *See, e.g.*, *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008) (suggesting that it is "unnecessary" to engage in *Skidmore* analysis if "the statute itself speaks clearly to the point at issue"); *Exxon Mobil Corp. & Affiliated Cos. v. Comm'r of Internal Revenue*, 689 F.3d 191, 200 n.13 (2d Cir. 2012) (explaining that *Skidmore* analysis applies to "an agency's interpretation of an ambiguous statute"); *Wong v. Doar*, 571 F.3d 247, 258 (2d Cir. 2009) (concluding that "Congress did not speak directly to the issue" before proceeding to apply *Skidmore* deference); *see also Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) ("[D]eference to [an agency's] statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent."); *High Sierra Hikers Ass'n v.*

---

one court recently put it, "has had a rough go of it ever since the birth of *Chevron*.  Like the figurative older child neglected in the wake of a new sibling's arrival, in 1984 *Skidmore* was relegated to the status of an administrative law sideshow while the courts fawned over *Chevron*."  *Angiotech Pharmaceuticals Inc. v. Lee*, --- F. Supp.3d ---, No. 1:15-cv-1673, 2016 WL 3248352, at *4, 2016 U.S. Dist. LEXIS 75662, at *13 (E.D. Va. June 8, 2016) (Ellis, J.).  Remarkably, "by the age of just three and a half years, courts had cited *Chevron* over six hundred times, and by the time *Chevron* turned sixteen," a year before *Mead*, "some were ready to declare *Skidmore* dead altogether."  *Id*. (collecting cases and secondary sources).

*Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004) ("If the statute is clear and unambiguous, no deference is required and the plain meaning of Congress will be enforced.").  As commentators have noted, although the Supreme Court has not explicitly stated "that *Skidmore* necessarily includes a 'step one' inquiry along the lines of *Chevron* [S]tep [O]ne[,] . . . in practice, *Skidmore* generally does include a 'step one,'" in which a court "first review[s] the statute for a plain meaning [to] determin[e] [whether] the statute [is] ambiguous."  Kristin E. Hickman & Matthew D. Krueger, *In Search of the Modern Skidmore Standard*, 107 COLUM. L. REV. 1235, 1280 (2007) (collecting cases).

But as the dissent correctly notes, *see* Dissent at 21-22, it does not follow that a particular application of the *Skidmore* framework implies a threshold conclusion that the relevant statutory language is ambiguous.  Although a court could first conclude that the text is unambiguous—and therefore that *Skidmore* deference is inappropriate or unnecessary[19]—it could instead engage in *Skidmore* analysis without answering this threshold question by considering the statutory text as one of several factors relevant to determining whether the agency

---

[19] *Skidmore* deference would be inappropriate with respect to an agency interpretation that is inconsistent with unambiguous statutory text.  But with respect to an agency interpretation consistent with the unambiguous text, *Skidmore* deference would simply be unnecessary.

interpretation has the "power to persuade." *Skidmore*, 323 U.S. at 140. Yet even under this approach, courts will not rely on agency interpretations that are inconsistent with unambiguous statutory language. *See, e.g., EEOC v. Arabian American Oil*, 499 U.S. 244, 257 (1991) (declining to rely on an agency interpretation that "lack[ed] support in the plain language of the statute" after considering the statutory language as one of several factors relevant to *Skidmore* analysis).[20] Thus, regardless of whether or not a court makes a threshold ambiguity determination, "the *Skidmore* standard implicitly replicates *Chevron*'s first step." Hickman & Krueger, *supra*, at 1247.

Our application of the *Skidmore* deference standard in *Catskill I* and *Catskill II* makes clear that we did not decide and have not decided that the statutory language at issue in this case—"addition . . . to navigable waters"—is unambiguous. Although we did not explicitly conclude in those cases that the statutory text was ambiguous, we made clear that we did not intend to foreclose

---

[20] The dissent stresses that *Skidmore* analysis is flexible and that the clarity of statutory language is one factor among many in assessing an agency interpretation's power to persuade. *See* Dissent at 24. *Skidmore* is not, however, so flexible that a court could accord *Skidmore* deference to an agency interpretation inconsistent with unambiguous statutory text. Any interpretation inconsistent with unambiguous statutory language necessarily lacks persuasive power. *See Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11 (1980) (explaining that "[a] regulation is [not] entitled to deference" under *Skidmore* if "it can be said not to be a reasoned and supportable interpretation of the [statute]").

the EPA from adopting a unitary-waters reading of the Act (i.e., waters of the United States means all of those waters rather than each of them) in a formal rule; indeed, we stated in *Catskill I* that "[i]f the EPA's position had been adopted in a rulemaking or other formal proceeding, [*Chevron*] deference . . . might be appropriate." *Catskill I*, 273 F.3d at 490-91 & n.2. This statement implies that we thought the relevant statutory text was at least possibly ambiguous.

The few references to "plain meaning" in *Catskill I* and *Catskill II* do not compel a different conclusion. The crucial interpretive question framed by *Catskill I*—which we identified as the "crux" of the appeal—was "the meaning of 'addition,' which the Act does not define." *Id.* at 486. As the dissent points out, *see* Dissent at 25-27, we concluded in *Catskill I* that, based on the "plain meaning" of that term, the transfer of turbid water resulted in "an 'addition' of a 'pollutant' from a 'point source'[21] . . . to a 'navigable water.'" *Catskill I*, 273 F.3d at 492.[22] We

---

[21] *See supra* note 8 for the definition of "point source" contained it 33 U.S.C. § 1362(14).

[22] In *Catskill I*, we also discussed the so-called "dams cases," *National Wildlife Federation v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982), and *National Wildlife Federation v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988). In these opinions, the District of Columbia and Sixth Circuits deferred to the EPA's position that water released back into the same surrounding water from which it was taken is not an "addition" to navigable waters under the CWA, even though the water so released contained material that either was or could be considered a pollutant. *Gorsuch*, 693 F.2d at 174-75, 183; *Consumers Power*, 862 F.2d at 584-87, 589. We noted that our definition of "addition" was consistent with the holdings in the dams cases, because "[i]f one takes a ladle of soup from a pot, lifts it

do not, however, think that by referring to the "plain meaning" of "addition" in *Catskill I* we were holding that the broader statutory phrase "addition . . . to navigable waters" *unambiguously* referred to a collection of individual "navigable waters"—such that the term "to navigable waters" could possibly mean only "to *a* navigable water" or "to *any* navigable water," and not to "navigable waters" in the collective singular (i.e., "*all* the qualifying navigable waters viewed as a single, 'unitary' entity"). Nowhere in *Catskill I* did we state that "navigable waters" or the broader phrase "addition . . . to navigable waters" could bear only one meaning based on the unambiguous language contained in the statute. Such a statement would have been inconsistent with our acknowledgment that *Chevron* deference might be owed to a more formal agency interpretation.

Nor did we make any such statement in *Catskill II*. There, we began by succinctly summarizing *Catskill I* as "concluding that the discharge of water

---

above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot." *Catskill I*, 273 F.3d at 492. We explained that *Catskill I* was factually distinguishable from those cases because it involved the discharge of water from one distinct body of water (the Schoharie Reservoir) into another (the Esopus Creek). *Id.* at 491-92. *Gorsuch* and *Consumers Power* have no bearing on the meaning of the term "navigable waters" because the discharges at issue in those cases would not constitute "addition[s] . . . to navigable waters" either under a unitary-waters theory (because the potential pollutants in the dams cases were already within the navigable waters) or a non-unitary-waters theory (because those potential pollutants were not transferred from one navigable water body to another). These two cases therefore have no bearing on the outcome of this appeal.

containing pollutants from one distinct water body into another is an 'addition of [a] pollutant' under the CWA."  *Catskill II*, 451 F.3d at 80 (brackets in original) (citing *Catskill I*, 273 F.3d at 491-93).  We then again rejected the City's arguments in favor of reconsidering *Catskill I*, including its argument in favor of the "unitary-water theory of navigable waters," essentially for the reasons stated in *Catskill I*—most importantly, that these arguments "simply overlook[ed]" the "plain language" and "ordinary meaning" of the term "addition."  *Id.* at 81-84.  We also noted that in the then-recent *Miccosukee* decision, the Supreme Court noted the existence of the unitary-waters theory and raised possible arguments against it, providing further support for our rejection of the theory in *Catskill I*.  *Catskill II*, 451 F.3d at 83 (citing *Miccosukee*, 541 U.S. at 105-09).  Nowhere did we state that the phrase "addition . . . to navigable waters" was unambiguous such that it would preclude *Chevron* deference in the event that the EPA adopted a formal rule.  We held only that the EPA's position, as expressed in an informal interpretation, was unpersuasive under the *Skidmore* framework.  *Id*. at 83 & n.5 (noting that under *Skidmore* "[w]e . . . defer to the agency interpretation according to its 'power to persuade'" and "declin[ing] to defer to the EPA" under that standard (quoting *Mead*, 533 U.S. at 235)).

The best interpretation of *Catskill I* and *Catskill II*, we think, is that those decisions set forth what those panels saw as the most persuasive reading of the phrase "addition . . . to navigable waters" in light of how the word "addition" is plainly and ordinarily understood.  *Catskill I* and *Catskill II* did not hold that "addition . . . to navigable waters" could bear only one meaning, such that the EPA could not interpret the phrase differently in an interpretive rule.  Therefore, as the district court concluded, neither *Catskill I* nor *Catskill II* requires us to resolve this appeal at *Chevron* Step One.

### B.  *Statutory Text, Structure, and Purpose*

Having determined that the meaning of the relevant provision of the Clean Water Act has not been resolved by prior case law, we turn to the overall statute and its context.  In evaluating whether Congress has directly spoken to whether NPDES permits are required for water transfers, we employ the "traditional tools of statutory construction."  *Li v. Renaud*, 654 F.3d 376, 382 (2d Cir. 2011) (quoting *Chevron*, 467 U.S. at 843 n.9).  We examine the statutory text, structure, and purpose as reflected in its legislative history.  *See id.*  If the statutory text is ambiguous, we also examine canons of statutory construction.  *See Lawrence + Mem'l Hosp.*, 812 F.3d at 264; *see also Am. Farm Bureau Fed'n v. EPA*, 792 F.3d 281,

301 (3d Cir. 2015), *cert. denied*, 136 S. Ct. 1246 (2016); *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012); *EEOC v. Seafarers Int'l Union*, 394 F.3d 197, 203 (4th Cir. 2005).

*1. Statutory text and structure.*

"As with any question of statutory interpretation, we begin with the text of the statute to determine whether the language at issue has a plain and unambiguous meaning." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 108 (2d Cir. 2012). The statutory language at issue is found in Sections 301, 402, and 502 of the Clean Water Act. Section 301(a) states that "[e]xcept as in compliance with [the Act], the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). Section 402(a)(1) states that the EPA may issue an NPDES permit allowing the "discharge of any pollutant, or combination of pollutants, notwithstanding [Section 301(a)]," so long as the discharge meets certain requirements specified by the Clean Water Act and the permit. *See id.* § 1342(a)(1). Section 502 defines the term "discharge of a pollutant," in relevant part, as "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). Section 502 also defines the term "navigable waters" as "the waters of the United States, including the territorial seas." *Id.* § 1362(7). But

nowhere do these provisions speak directly to the question of whether an NPDES permit may be required for a water transfer.

Nor is the meaning of the relevant statutory text plain. The question, as we have indicated above, is whether "addition of any pollutant to navigable waters"—or, "addition of any pollutant to the waters of the United States"—refers to *all* navigable waters, meaning *all* of the waters of the United States viewed as a singular whole, or to *individual* navigable waters, meaning *one of* the waters of the United States. The term "waters" may be used in either sense: As the Eleventh Circuit observed, "[i]n ordinary usage 'waters' can collectively refer to several different bodies of water such as 'the waters of the Gulf coast,' or can refer to any one body of water such as 'the waters of Mobile Bay.'" *Friends I*, 570 F.3d at 1223. The Supreme Court too has noted that the phrase "[w]aters of the United States," as used in Section 502, is "in some respects ambiguous." *Rapanos v. United States*, 547 U.S. 715, 752 (2006) (internal quotation marks omitted) (emphasis removed). The statutory text yields no clear answer to the question before us; it could

support either of the interpretations proposed by the parties.[23]  Thus, based on the text alone, we remain at sea.

Unfortunately, placing this statutory language in the broader context of the Act as a whole does not help either.  A statutory provision's plain meaning may be "understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." *Louis Vuitton*, 676 F.3d at 108 (quoting *Saks v. Franklin Covey Co.*, 316 F.3d 337, 345 (2d Cir. 2003)).  "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (internal quotation marks omitted) (quoting *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012)).  Examination of the other uses of the terms "navigable waters" and "waters" elsewhere in the Clean Water Act does not establish that these terms can bear only one meaning.  The Clean Water Act sometimes regulates individual water bodies and other times entire water systems.

---

[23] We find the dissent's arguments relating to the ordinary meaning of the term "addition" to be unpersuasive. *See* Dissent at 9-10.  We agree that the ordinary meaning of that term refers to an increase or an augmentation.  But that dictionary definition does not answer the question at issue here: whether such an increase or augmentation occurs when a pollutant is moved from one body of water to another.  In addressing that question, we must consider the entire statutory phrase, "addition . . . to navigable waters," not simply the definition of the term "addition."

As the plaintiffs and the dissent point out, several other provisions in the Clean Water Act suggest that "navigable waters" refers to any of several individual water bodies, specifically the Act's references to:

- "the navigable waters involved," 33 U.S.C. § 1313(c)(2)(A), (c)(4);
- "those waters or parts thereof," *id.* § 1313(d)(1)(B);
- "all navigable waters," *id.* § 1314(a)(2);
- "any navigable waters," *id.* § 1314(f)(2)(F);
- "those waters within the State" and "all navigable waters in such State," *id.* § 1314(l)(1)(A)-(B);
- "all navigable waters in such State" and "all navigable waters of such State," *id.* § 1315(b)(1)(A)-(B); and
- "the navigable waters within the jurisdiction of such State," "navigable waters within [the State's] jurisdiction," and "any of the navigable waters," *id.* § 1342.

But this pattern of usage does not establish that "navigable waters" cannot ever refer to all waters as a singular whole because it also suggests that when Congress wants to make clear that it is using "navigable waters" in a particular sense, it can and sometimes does provide additional language as a beacon to guide interpretation. *Cf. Rapanos*, 547 U.S. at 732-33 (holding that "[t]he use of the definite article ('the') and the plural number ('waters')" made clear that § 1362(7) is limited to "fixed bodies of water," such as "streams, . . . oceans, rivers, [and] lakes," and does not extend to "ordinarily dry channels through which water

43

occasionally or intermittently flows").[24]  If Congress had thought about the question and meant for Section 502(12) of the Clean Water Act to refer to individual water bodies, it could have referred to something like "any addition of any pollutant to *a navigable water* from any point source," or "any addition of any pollutant to *any navigable water* from any point source."  As the plaintiffs and the dissent would have it, the phrases "addition to navigable waters," "addition to a navigable water," and "addition to any navigable water" necessarily mean the same thing, at least in the context of the Act.  We do not disagree that the phrases *could* be interpreted to have the same meaning, but we disagree that this interpretation is clearly and unambiguously mandated in light of how the terms "navigable waters" and "waters" are used in other sections of the Act.

We thus see nothing in the language or structure of the Act that indicates that Congress clearly spoke to the precise question at issue: whether Congress intended to require NPDES permits for water transfers.

---

[24] Contrary to the dissent's suggestion, the Supreme Court's holding in *Rapanos* does not compel the conclusion that the statutory phrase "navigable waters" is unambiguous because that phrase, unlike the phrase addressed in *Rapanos*, is not limited by a definite article.  *See* Dissent at 6-9.

*2. Statutory purpose and legislative history*

Inasmuch as the statutory text, context, and structure have yielded no definitive answer to the question before us, we conclude the first step of our *Chevron* analysis by looking to whether Congress's purpose in enacting the Clean Water Act establishes that the phrase "addition . . . to navigable waters" can reasonably bear only one meaning. *See Gen. Dynamics*, 540 U.S. at 600 (using both statutory purpose and history at *Chevron* Step One). Beginning with the name of the statute, it seems clear enough that the predominant goal of the Clean Water Act is to ensure that our nation's waters are "clean," at least in the sense of being reasonably free of pollutants. The Act itself states that its main objective is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The plaintiffs and the dissent argue that exempting water transfers from the NPDES permitting program could frustrate the achievement of this goal by allowing unmonitored transfers of polluted water from one water body to another. *Cf. Catskill II*, 451 F.3d at 81 (observing that a unitary-waters interpretation of navigable waters would allow for "the transfer of water from a heavily polluted, even toxic, water body to one that was pristine").

45

As the Supreme Court has noted, however, "no law pursues its purpose at all costs." *Rapanos*, 547 U.S. at 752. We see no reason to think that the Clean Water Act is an exception. To the contrary, the Clean Water Act is "among the most complex" of federal statutes, and it "balances a welter of consistent and inconsistent goals," *Catskill I*, 273 F.3d at 494, establishing a complicated scheme of federal regulation employing both federal and state implementation and supplemental state regulation, *see, e.g.*, 33 U.S.C. § 1251(g) (federal agencies must cooperate with state and local governments to develop "comprehensive solutions" for pollution "in concert with . . . managing water resources"). In this regard, the Act largely preserves states' traditional authority over water allocation and use, while according the EPA a degree of policymaking discretion and flexibility with respect to water quality standards—both of which might well counsel against requiring NPDES permits for water transfers and instead in favor of letting the States determine what administrative regimen, if any, applies to water transfers. Accordingly, Congress's broad purposes and goals in passing the Act do not alone establish that the Act unambiguously requires that water transfers be subject to NPDES permitting.

Even careful analysis of the Clean Water Act's legislative history does not help us answer the interpretive question before us.  Although we are generally "reluctant to employ legislative history at step one of *Chevron* analysis," legislative history is at times helpful in resolving ambiguity; for example, when the "'interpretive clues [speak] almost unanimously,' making Congress's intent clear 'beyond reasonable doubt.'" *Mizrahi v. Gonzales*, 492 F.3d 156, 166 (2d Cir. 2007) (quoting *Gen. Dynamics*, 540 U.S. at 586, 590).  But here Congress has not left us a trace of a clue as to its intent.  The more than 3,000-page legislative history of the Clean Water Act appears to be silent, or very nearly so, as to the applicability of the NPDES permitting program to water transfers. *See generally* Comm. on Env't. & Pub. Works, 95th Cong., 2d Sess., A Legislative History of the Clean Water Act of 1977 & A Continuation of the Legislative History of the Federal Water Pollution Control Act (1978); Comm. on Pub. Works, 93rd Cong., 1st Sess., A Legislative History of the Water Pollution Control Act Amendments of 1972 (1973).  As we noted in *Catskill I*, the legislative history does not speak to the meaning of the term "addition" standing alone, 273 F.3d at 493, suggesting that the history is similarly silent as to the meaning of the broader phrase that includes this term, "addition . . . to navigable waters."

Finally and tellingly, neither the parties nor *amici* have pointed us to any legislative history that clearly addresses the applicability of the NPDES permitting program to water transfers. What few examples from the legislative history they have cited—such as the strengthening of the permit requirements in Section 301(b)(1)(C) to include water quality-based limits in addition to technology-based limitations, *see* William L. Andreen, *The Evolution of Water Pollution Control in the United States—State, Local, and Federal Efforts, 1789-1972: Part II*, 22 Stan. Envtl. L.J. 215, 270, 275-77 (2003), and broad aspirational statements about the elimination of water pollution and the need to regulate every point source by the report of the Senate's Environment and Public Works Committee, S. Rep. No. 92-414, at 3738, 3758 (1971), provide at most keyhole-view insights into Congress's intent. They do not speak to the issue before us with the "high level of clarity" necessary to resolve the textual ambiguity before us at *Chevron* Step One. *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 120 (2d Cir. 2007). The question is whether Congress has "*directly* spoken," *Chevron*, 467 U.S. at 842, to whether NPDES permits are required for water transfers—not whether it has made a stray or oblique reference to that issue here and there.

*3. Canons of statutory construction*

The traditional canons of statutory construction also provide no clear answer to the question whether Congress intended that the NPDES permitting system apply to water transfers.

First, the dissent asserts that the Water Transfers Rule violates the principle that "'[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent,'" *Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) (quoting *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980)). *See* Dissent at 12-14. Contrary to the dissent's assertion, however, that canon of construction is not applicable where, as here, the issue is not whether to create an implied exception to a general prohibition, but the scope of the general prohibition itself.[25]

---

[25] The dissent's argument proceeds as follows: (1) the Act imposes a general ban on "the discharge of any pollutant," defined by Section 502 as "any addition . . . to navigable waters"; (2) the Act specifies certain exemptions to the general ban; and (3) the Water Transfers Rule must be rejected because it effectively creates an implied exemption to the general ban on the discharge of pollutants. *See* Dissent at 12-14. This strikes us as decidedly circular: It presupposes that the scope of the general ban on the discharge of pollutants, as defined by Section 502, extends to water transfers in order to conclude that the Water Transfers Rule is an exemption from that general ban. This argument, therefore, is unhelpful because it sidesteps the question at issue here— whether "any addition . . . to navigable waters" is ambiguous.

Second, the plaintiffs invoke the canon of construction that a "statute should be interpreted in a way that avoids absurd results." *SEC v. Rosenthal*, 650 F.3d 156, 162 (2d Cir. 2011) (quoting *United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004)). They again underscore their arguments concerning statutory purpose in arguing that by allowing for the unpermitted transfer of polluted water from one water body to another, the Water Transfers Rule is contrary to the Act's principal stated objective: "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Additionally, the plaintiffs argue that the Water Transfers Rule may undermine the ability of downstream states to protect themselves from the pollution generated by upstream states.

The simplicity of the plaintiffs' approach helps cloak their arguments with considerable force. But we are ultimately not persuaded that they establish that the Clean Water Act unambiguously forecloses the EPA's interpretation in the Water Transfers Rule. Indeed, it is unclear to us how one can argue persuasively that the Water Transfers Rule leads to a result so absurd that the result could not possibly have been intended by Congress, while asserting at the same time that it codifies the EPA's practice of not issuing NPDES permits that has prevailed for

50

decades without Congressional course-correction of any kind. In light of the immense importance of water transfers, it seems more likely that Congress has contemplated the very result that the plaintiffs argue is foreclosed by the Act, and acquiesced in that result.

Furthermore, as the plaintiffs would have it, the EPA and the States could not, consistent with the Clean Water Act, select *any* policy that does not improve water quality as much as is possible. But the Clean Water Act is more flexible than that. Far from establishing a maximalist scheme under which water quality must be pursued at all costs, the Act leaves a considerable amount of policymaking discretion in the hands of both the EPA and the States—entirely understandably in light of its "welter of consistent and inconsistent goals." *Catskill I*, 273 F.3d at 494. We cannot say that the Act could not reasonably be read to permit water transfers to be exempt from the NPDES permitting program, in light of the possibility that other measures will do. Although the tension between the Rule's reading of the Act and the statute's overall goal of improving water quality casts some doubt on the reasonableness of the Rule, it may nevertheless be understandable and permissible if it furthers other objectives of the statute.

We think that the legislative compromises embodied in the Act counsel against the application of the absurdity canon here.  We generally apply that canon only "where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone." *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 470-71 (1989) (Kennedy, J., concurring in the judgment) (citation omitted).  Exempting water transfers from the NPDES program does not, we conclude, lead directly to a result so absurd it could not possibly have been contemplated by Congress.

As to the effect of the Rule on downstream states, even in the absence of NPDES permitting for water transfers, the States can seek to protect themselves against polluted water transfers through other means—for example, through filing a common-law nuisance or trespass lawsuit in the polluting state's courts, *see, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497-98 (1987)—even if the protections provided by such lawsuits are less robust than those that would be available through the NPDES permitting program's application to transfers.[26] The inconsistency of the Water Transfers Rule with the Clean Water Act's

---

[26] Although common-law nuisance and trespass lawsuits may take a long time to work through the court system, preliminary injunctions may be available in urgent cases.

primary objective may be a strike against its reasonableness, but only one strike, which is not enough for the EPA's position to be "out."

Third, arguing to the contrary, the defendants and *amicus curiae* State of California argue that we should reject the plaintiffs' preferred interpretation of Section 402 of the Clean Water Act (i.e., that permits are required for water transfers) based on a clear-statement rule and principles of federalism derived from the Supreme Court's decisions in *Solid Waste Agency of Northern Cook County v. United States Army Corps of Engineers*, 531 U.S. 159 (2001) (*"SWANCC"*), and *Rapanos*, as well as the Tenth Amendment. If that were so, it would make our task much easier. But we think it is incorrect. To the extent that *SWANCC* and *Rapanos* establish a clear-statement rule, it does not apply here.

In *SWANCC*, the Supreme Court addressed the "Migratory Bird Rule" issued by the U.S. Army Corps of Engineers (the "Corps") under which the Corps asserted jurisdiction pursuant to Section 404(a) of the Clean Water Act to require permits for the discharge of dredged or fill material into intrastate waters used as habitat by migratory birds. *SWANCC*, 531 U.S. at 163-64. The Rule applied even to small, isolated ponds located entirely within a single state, such as those located in the abandoned sand and gravel pit there at issue. *See id.* at 163-65. The

Court reasoned that, "[w]here an administrative interpretation of a statute invokes the outer limits of Congress' power, [it] expect[s] a clear indication that Congress intended that result," and that "[t]his concern is heightened where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 172-73. Thus, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* at 173 (quoting *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988)). The Supreme Court rejected the Corps' interpretation because (1) the Migratory Bird Rule "raise[d] significant constitutional questions" with respect to Congress's authority under the Commerce Clause; (2) Congress had not clearly stated "that it intended § 404(a) to reach an abandoned sand and gravel pit"; and (3) the Corps' interpretation of Section 404(a) "would result in a significant impingement of the States' traditional and primary power over land and water use." *Id.* at 173-74.

In *Rapanos*, a plurality of the Supreme Court rejected the EPA's interpretation of the Clean Water Act as providing authority to regulate isolated

wetlands lying near ditches or artificial drains that eventually empty into "navigable waters" because the wetlands are adjacent to "waters of the United States." *Rapanos*, 547 U.S. at 723-24, 729, 739. The plurality rejected the interpretation because it "would authorize the Corps to function as a *de facto* regulator of immense stretches of intrastate land," which was impermissible because a "'clear and manifest' statement from Congress" is required "to authorize an unprecedented intrusion" into an area of "traditional state authority" such as the regulation of land use. *Id.* at 738 (citation omitted). Citing *SWANCC*, the Court also noted that "the Corps' interpretation stretches the outer limits of Congress's commerce power and raises difficult questions about the ultimate scope of that power," which further counseled in favor of requiring a clear statement from Congress in order to authorize such jurisdiction. *Id.* (citing *SWANCC*, 531 U.S. at 173).

The clear-statement rule articulated in *SWANCC* and *Rapanos* does not apply here. The case at bar presents no question regarding Congress's authority under the Commerce Clause, inasmuch as it is undisputed that Congress has the power to regulate navigable waters and to delegate its authority to do so. *SWANCC* and *Rapanos* both involved attempts by the Army Corps of Engineers

to extend the scope of the phrase "navigable waters" to include areas not traditionally understood to be such. They were therefore treated as attempts by the Corps to stretch the limits of its delegated authority vis-à-vis the States. Here, the EPA is not seeking to expand the universe of waters deemed to be "navigable." The question before us is not whether the EPA has the authority to regulate water transfers; it is whether the EPA is using (or not using) that authority in a permissible manner.

The Clean Water Act was *designed* to alter the federal-state balance with respect to the regulation of water quality. Congress passed the Act precisely because it found inconsistent state-by-state regulation not up to the task of restoring and maintaining the integrity of the nation's waters. *See* S. Rep. No. 95-370, at 1 (1977) (the Act is intended to be a "comprehensive revision of national water quality policy"). True, as the defendants point out, water allocation is an area of traditional state authority. But again, we are concerned here not with water allocation, but with water quality. We know of no authority or accepted principle that would require a "clear statement" by Congress before the EPA could adopt the plaintiffs' preferred interpretation of the Act.

Fourth, and finally, several of the defendants raise the related argument that requiring permits for water transfers under the plaintiffs' preferred interpretation would pose a serious Tenth Amendment[27] problem because it would upset the traditional balance of federal and state power with respect to water regulation. This, in turn, would violate the canon of constitutional avoidance, which provides that if one of two competing statutory interpretations "would raise a multitude of constitutional problems, the other should prevail." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("The so-called canon of constitutional avoidance is an interpretive tool, counseling that ambiguous statutory language be construed to avoid serious constitutional doubts."). These defendants argue that the EPA's interpretation must prevail because it avoids this constitutional problem.

But the plaintiffs' proposed interpretation raises no Tenth Amendment concerns that we can discern because it would not result in federal overreach into states' traditional authority to allocate water quantities. The Clean Water Act's preservation of states' water-allocation authority "do[es] not limit the scope of water pollution controls that may be imposed on users who have obtained,

---

[27] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

pursuant to state law, a water allocation."  *PUD No. 1 of Jefferson Cty. v. Wash.*

*Dep't of Ecology*, 511 U.S. 700, 720 (1994).  As we noted in *Catskill II*, the "flexibility

built into the [Act] and the NPDES permit scheme," which includes variances,

general permits, and the consideration of costs in setting effluent limitations,

"allow[s] federal authority over quality regulation and state authority over

quantity allocation to coexist without materially impairing either."[28]  451 F.3d at

85-86.  The resolution of this appeal is not dictated by a clear-statement rule or

the Tenth Amendment, but rather by straightforward considerations of statutory

interpretation.

We conclude, then, that Congress did not in the Clean Water Act speak

directly to the question of whether NPDES permits are required for water

transfers.[29]  The Act is therefore silent or ambiguous as to this question, which

---

[28] There is no reason to think that applying the NPDES program to water transfers would turn the prior appropriation doctrine ("first in time, first in right") on its head, as some of the defendants insist.  *See* Western States Br. 31-32.  NPDES permits merely put restrictions on water discharges, without changing priority or ownership rights.

[29] The dissent asserts that in reaching this conclusion we are effectively construing "navigable waters" to mean all the navigable waters of the United States, collectively.  *See* Dissent at 6.  Not so:  By concluding that the phrase "addition . . . to navigable waters" is ambiguous for purposes of *Chevron* Step One, we are emphatically declining to adopt any construction of the statute in the first instance.  We are instead acknowledging that Congress has left the task of resolving that ambiguity to the EPA by delegating to that agency the authority "to make rules carrying the force of law" to which we must defer so long as they are reasonable.  *Mead*, 533 U.S. at 226-27.

means that this case cannot be resolved by the Step One analysis under *Chevron*.

*See also Friends I*, 570 F.3d at 1227 (similarly concluding at *Chevron* Step One that the statutory phrase "addition . . . to navigable waters" is ambiguous).

Accordingly, we proceed to Step Two. *See New York v. FERC*, 783 F.3d 946, 954 (2d Cir. 2015).

**II.    *Chevron* Step Two**

At last, we reach the application of the second step of *Chevron* analysis, upon which our decision to reverse the district court's judgment turns. We conclude that the EPA's interpretation of the Clean Water Act is reasonable and neither arbitrary nor capricious. Although the Rule may or may not be the best or most faithful interpretation of the Act in light of its paramount goal of restoring and protecting the quality of U.S. waters, it is supported by several valid arguments—interpretive, theoretical, and practical. And the EPA's interpretation of the Act as reflected in the Rule seems to us to be precisely the kind of policymaking decision that *Chevron* is designed to protect from overly intrusive judicial review. As we have already pointed out, although we might prefer a different rule more clearly guaranteed to reach the environmental concerns underlying the Act, *Chevron* analysis requires us to recognize that our preference does not matter. We conclude that the Water Transfers Rule satisfies

*Chevron*'s deferential standard of review, and, accordingly, we reverse the judgment of the district court.

### A. Legal Standard

The question for the reviewing court at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843). We will not disturb an agency rule at *Chevron* Step Two unless it is "arbitrary or capricious in substance, or manifestly contrary to the statute." *Id.* at 53 (quoting *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 242 (2004)); *see also Lawrence + Mem'l Hosp.*, 812 F.3d at 264. Generally, an agency interpretation is not "arbitrary, capricious, or manifestly contrary to the statute" if it is "reasonable." *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("[A]t [*Chevron*'s] second step the court must defer to the agency's interpretation if it is 'reasonable.'" (quoting *Chevron*, 467 U.S. at 844)); *Mayo*, 562 U.S. at 58 ("[T]he second step of *Chevron* . . . asks whether the [agency's] rule is a 'reasonable interpretation' of the enacted text." (quoting *Chevron*, 467 U.S. at 844)); *Lee v. Holder*, 701 F.3d 931, 937 (2d Cir. 2012); *Adams v. Holder*, 692 F.3d 91, 95 (2d Cir. 2012). The agency's view need not be "the only possible interpretation, nor even the interpretation deemed

*most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original). This approach "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000). When interpreting ambiguous statutory language "involves difficult policy choices," deference is especially appropriate because "agencies are better equipped to make [these choices] than courts." *Brand X*, 545 U.S. at 980.

"Even under this deferential standard, however, agencies must operate within the bounds of reasonable interpretation," *Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) (internal quotation marks omitted), and we therefore will not defer to an agency interpretation if it is not supported by a reasoned explanation, *see Vill. of Barrington, Ill. v. Surface Transp. Bd.*, 636 F.3d 650, 660 (D.C. Cir. 2011). An agency interpretation would surely be "arbitrary" or "capricious" if it were picked out of a hat, or arrived at with no explanation, even if it might otherwise be deemed reasonable on some unstated ground.

In the course of its *Chevron* Step Two analysis, the district court incorporated the standard for evaluating agency action under APA § 706(2)(A)

set forth in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29 (1983) ("*State Farm*"), a much stricter and more exacting review of the agency's rationale and decisionmaking process than the *Chevron* Step Two standard.  Under that section, a reviewing court may set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  In *State Farm*, the Supreme Court explained that under Section 706(2)(A),

> an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

463 U.S. at 43.  On appeal, the plaintiffs urge us to incorporate the *State Farm* standard into our *Chevron* Step Two analysis, and to affirm the district court's vacatur of the Rule for essentially the same reasons stated by the court.  While we have great respect for the district court's careful and searching analysis of the EPA's rationale for the Water Transfers Rule, we conclude that it erred by incorporating the *State Farm* standard into its *Chevron* Step Two analysis and thereby applying too strict a standard of review.  An agency's initial interpretation of a statutory provision should be evaluated only under the

*Chevron* framework, which does not incorporate the *State Farm* standard. *State Farm* review may be appropriate in a case involving a non-interpretive rule or a rule setting forth a changed interpretation of a statute; but that is not so in the case before us.

As the Supreme Court, our Circuit, and other Courts of Appeals have made reasonably clear, *State Farm* and *Chevron* provide for related but distinct standards for reviewing rules promulgated by administrative agencies. *See, e.g., Encino*, 136 S. Ct. at 2125-26; *Judulang v. Holder*, 132 S. Ct. 476, 483 n.7 (2011); *Nat. Res. Def. Council*, 808 F.3d at 569; *New York v. FERC*, 783 F.3d at 958; *Pub. Citizen, Inc. v. Mineta*, 340 F.3d 39, 53 (2d Cir. 2003); *N.Y. Pub. Interest Research Grp. v. Whitman*, 321 F.3d 316, 324 (2d Cir. 2003); *see also, e.g., Shays v. FEC*, 414 F.3d 76, 96-97 (D.C. Cir. 2005); *Arent v. Shalala*, 70 F.3d 610, 619 (D.C. Cir. 1995) (Wald, J., concurring). *State Farm* is used to evaluate whether a rule is procedurally defective as a result of flaws in the agency's decisionmaking process. *See Encino*, 136 S. Ct. at 2125; *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 784 (2016). *Chevron*, by contrast, is generally used to evaluate whether the conclusion reached as a result of that process—an agency's interpretation of a statutory provision it administers—is reasonable. *See Encino*, 136 S. Ct. at 2125; *Entergy*,

556 U.S. at 217-18.  A litigant challenging a rule may challenge it under *State Farm*, *Chevron*, or both.  As Judge Wald explained,

> there are certainly situations where a challenge to an agency's regulation will fall squarely within one rubric, rather than the other.  For example, we might invalidate an agency's decision under *Chevron* as inconsistent with its statutory mandate, even though we do not believe the decision reflects an arbitrary policy choice.  Such a result might occur when we believe the agency's course of action to be the most appropriate and effective means of achieving a goal, but determine that Congress has selected a different—albeit, in our eyes, less propitious—path.  Conversely, we might determine that although not barred by statute, an agency's action is arbitrary and capricious because the agency has not considered certain relevant factors or articulated any rationale for its choice.  Or, along similar lines, we might find a regulation arbitrary and capricious, while deciding that *Chevron* is inapplicable because Congress' delegation to the agency is so broad as to be virtually unreviewable.

*Arent*, 70 F.3d at 620 (Wald, J., concurring) (citation and footnotes omitted).

Much confusion about the relationship between *State Farm* and *Chevron* seems to arise because both standards purport to provide a method by which to evaluate whether an agency action is "arbitrary" or "capricious," and *Chevron* Step Two analysis and *State Farm* analysis often, though not always, take the same factors into consideration and therefore overlap.  *See Judulang*, 132 S. Ct. at 483 n.7 (stating, in a case governed by the *State Farm* standard, that had the Supreme Court applied *Chevron*, the "analysis would be the same, because under *Chevron* step two, we ask whether an agency interpretation is arbitrary or capricious in

substance" (internal quotation marks omitted)); *Pharm. Research & Mfrs. of Am. v. FTC*, 790 F.3d 198, 204 (D.C. Cir. 2015) (noting that it is "often the case" that an agency's "interpretation of its authority under *Chevron* Step Two overlaps with our arbitrary and capricious review under 5 U.S.C. § 706(2)(A)"); *Am. Petroleum Inst. v. EPA*, 216 F.3d 50, 57 (D.C. Cir. 2000) ("The second step of *Chevron* analysis and *State Farm* arbitrary and capricious review overlap, but are not identical.").

We read the case law to stand for the proposition that where a litigant brings both a *State Farm* challenge and a *Chevron* challenge to a rule, and the *State Farm* challenge is successful, there is no need for the reviewing court to engage in *Chevron* analysis. As the Supreme Court has explained, "where a proper challenge is raised to the agency procedures, and those procedures are defective, a court should not accord *Chevron* deference to the agency interpretation." *Encino*, 136 S. Ct. at 2125.[30] In other words, if an interpretive rule was promulgated in a procedurally defective manner, it will be set aside regardless of

---

[30] In *Encino*, which was decided after the briefing in this appeal had been completed, the Supreme Court declined to defer under *Chevron* to a Department of Labor regulation that departed from a longstanding earlier position due to a "lack of reasoned explication," inasmuch as the agency gave "almost no reasons at all" for the change in policy, and instead issued only vague blanket statements. 136 S. Ct. at 2127. Thus, the plaintiffs' indisputably proper procedural challenge was successful, and therefore the regulation was not entitled to *Chevron* deference, rendering an analysis under the two-step *Chevron* framework unnecessary. *See id.* at 2125-26.

whether its interpretation of the statute is reasonable. If the rule is not defective under *State Farm*, though, that conclusion does not avoid the need for a *Chevron* analysis, which does not incorporate the *State Farm* standard of review. In fact, in many recent cases, we have applied *Chevron* Step Two without applying *State Farm* or conducting an exacting review of the agency's decisionmaking and rationale. *See, e.g.*, *Stryker v. SEC*, 780 F.3d 163, 167 (2d Cir. 2015); *Florez v. Holder*, 779 F.3d 207, 211-12 (2d Cir. 2015); *Lee*, 701 F.3d at 937; *Adams*, 692 F.3d at 95; *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275 (2d Cir. 2012).

Several other considerations also counsel against employing the searching *State Farm* standard of review of the agency's decisionmaking and rationale at *Chevron* Step Two. The Supreme Court has decided that agencies are not obligated to conduct detailed fact-finding or cost-benefit analyses when interpreting a statute—which suggests that the full-fledged *State Farm* standard may not apply to rules that set forth for the first time an agency's interpretation of a particular statutory provision. *See, e.g.*, *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 651-52 (1990) (an agency may interpret an ambiguous statutory provision by making "judgments about the way the real world works" without making formal factual findings); *Entergy*, 556 U.S. at 223 (absent

statutory language to the contrary, an agency is not required to conduct cost-benefit analysis under *Chevron*); *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 510 (1981) ("When Congress has intended that an agency engage in cost-benefit analysis, it has clearly indicated such intent on the face of the statute."). These decisions seem to establish that while an agency may support its statutory interpretation with factual materials or cost-benefit analyses, an agency need not do so in order for its interpretation to be regarded as reasonable.

Further, the Supreme Court has cautioned that *State Farm* is "inapposite to the extent that it may be read as prescribing more searching judicial review" in a case involving an agency's "first interpretation of a new statute." *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 502 n.20 (2002); *see also Judulang*, 132 S. Ct. at 483 n.7 (stating that "standard arbitrary or capricious review under the APA" was appropriate because the agency action at issue was "not an interpretation of any statutory language" (internal quotation marks and brackets omitted)). Dovetailing with this point, the Supreme Court held in *Brand X* and *Fox Television Stations* that when an agency changes its interpretation of a particular statutory provision, this change is reviewable under APA § 706(2)(A), and will be set aside if the agency has failed to provide a "reasoned explanation . . . for disregarding

facts and circumstances that underlay or were engendered by the prior policy."

*Fox Television*, 556 U.S. at 516 ; *Brand X*, 545 U.S. at 981 (explaining that

"[u]nexplained inconsistency" is "a reason for holding an [agency] interpretation

to be an arbitrary and capricious change from agency practice under the [APA]").

Of course, if *all* interpretive rules were reviewable under APA § 706(2)(A) and

the *State Farm* standard, these pronouncements in *Brand X* and *Fox Television*

*Stations* would have been unnecessary. We also note that applying a

reasonableness standard to the agency's decisionmaking and rationale at *Chevron*

Step Two instead of a heightened *State Farm*-type standard promotes respect for

agencies' policymaking discretion and promotes policymaking flexibility.

For these reasons, the plaintiffs' challenge to the Water Transfers Rule is

properly analyzed under the *Chevron* framework, which does not incorporate the

*State Farm* standard.[31] We will therefore address only whether the EPA provided

a reasoned rationale for the Water Transfers Rule, and whether the Rule's

interpretation of the Clean Water Act is reasonable. As to the former, the

---

[31] None of the plaintiffs argue that the Rule was procedurally defective under APA § 706(2)(A), except for the Sportsmen and Environmental Organization Plaintiffs, who do so only in the context of a *Chevron* Step Two argument. *See* Sportsmen and Environmental Organization Pls.' Br. at 36-54, 58. In any event, as we have explained above, the interpretive Rule here is properly reviewed only under the *Chevron* standard, which does not incorporate the *State Farm* standard.

question is not whether the EPA's reasoning was flawless, impervious to counterarguments, or complete—the EPA only must have provided a reasoned explanation for its action.

### B. Reasoned Rationale for the EPA's Interpretation

We conclude that the EPA provided a reasoned explanation for its decision in the Water Transfers Rule to interpret the Clean Water Act as not requiring NPDES permits for water transfers. We can see from the EPA's rationale how and why it arrived at the interpretation of the Clean Water Act set forth in the Water Transfers Rule. It is clear that the EPA based the Rule on a holistic interpretation of the Clean Water Act that took into account the statutory language, the broader statutory scheme, the statute's legislative history, the EPA's longstanding position that water transfers are not subject to NPDES permitting, congressional concerns that the statute not unnecessarily burden water quantity management activities, and the importance of water transfers to U.S. infrastructure. *See* Water Transfers Rule, 73 Fed. Reg. at 33,699-33,703.

In the Water Transfers Rule, the EPA analyzed the text of the statute, explaining how its interpretation was justified by its understanding of the phrase "the waters of the United States," *id.* at 33,701, as well as by the broader statutory

scheme, noting that the Clean Water Act provides for several programs and regulatory initiatives other than the NPDES permitting program that could be used to mitigate pollution caused by water transfers, *id.* at 33,701-33,702. The EPA also justified the Rule by reference to statutory purpose, noting its view that "Congress intended to leave primary oversight of water transfers to state authorities in cooperation with Federal authorities," and that Congress intended to create a "balance . . . between federal and State oversight of activities affecting the nation's waters." *Id.* at 33,701. The EPA also stated that subjecting water transfers to NPDES permitting could affect states' ability to effectively allocate water and water rights, *id.* at 33,702, and explained how its interpretation was justified in light of the Act's legislative history, *see id.* at 33,703. The EPA concluded by addressing several public comments on the Rule, and explaining in a reasoned manner why it rejected proposed alternative readings of the Clean Water Act. *See id.* at 33,703-33,706.

This rationale, while not immune to criticism or counterargument, was sufficiently reasoned to clear *Chevron*'s rather minimal requirement that the agency give a reasoned explanation for its interpretation. We see nothing

70

illogical in the EPA's rationale.[32]  The agency provided a sufficiently reasoned explanation for its interpretation of the Clean Water Act in the Water Transfers Rule.  The Rule's interpretation of the Clean Water Act was therefore not adopted in an "arbitrary" or "capricious" manner.  Accordingly, we must address whether the Rule's interpretation of the Clean Water Act was, ultimately, reasonable.

## C. *Reasonableness of the EPA's Interpretation*

Having concluded that the EPA offered a sufficient explanation for adopting the Rule, we next examine whether the Rule reasonably interprets the Clean Water Act.  We conclude that it does.  The EPA's interpretation of the Clean Water Act as reflected in the Rule is supported by several valid arguments—interpretive, theoretical, and practical.  The permissibility of the Rule is reinforced by longstanding practice and acquiescence by Congress, recent

---

[32] The district court criticized the EPA's rationale for the Water Transfers Rule on the grounds that it was illogical for EPA to reason that: (1) Congress did not intend to subject water transfers to NPDES permitting; (2) therefore, water transfers do not constitute an addition to navigable waters; (3) because water transfers are not an "addition," they do not constitute a "discharge of a pollutant" under § 301(a), and therefore do not require an NPDES permit.  *Catskill III*, 8 F. Supp. 3d at 543.  According to the district court, because the NPDES program is only one of many provisions that regulate discharges made unlawful under § 301(a), step (1) could not possibly lead to steps (2) and (3)—that is, Congressional intent not to regulate water transfers under the NPDES program does not imply Congressional intent not to regulate water transfers under the other programs for regulating discharges of pollutants.  *Id.* at 544.  But the Water Transfers Rule did not exempt water transfers from any of the other programs for regulating discharges of pollutants—it applies only to the NPDES program.

case law, practical concerns regarding compliance costs, and the existence of alternative means for regulating pollution resulting from water transfers.

First, as far as we have been able to determine, in the nearly forty years since the passage of the Clean Water Act, water transfers have never been subject to a general NPDES permitting requirement. Congress thus appears to have, however silently, acquiesced in this state of affairs. This may well reflect an intent not to require NPDES permitting to be imposed in every situation in which it might be required, including as a means for regulating water transfers. This in turn suggests that the EPA's unitary-waters interpretation of Section 402 of the Act in the Water Transfers Rule is reasonable.

Second, the Supreme Court's decision in *Miccosukee* and the Eleventh Circuit's decision in *Friends I* support this conclusion. *Miccosukee* was decided before the EPA issued the Water Transfers Rule and, absent the interpretation of an agency rule, did not involve the application of *Chevron*. It was a citizen suit against the South Florida Water Management District (the "District"), which is also an intervenor-defendant in the instant proceedings. The *Miccosukee* plaintiffs argued that the District was impermissibly operating a pumping facility without an NPDES permit. 541 U.S. at 98-99. The district court granted

summary judgment to the plaintiffs; the Eleventh Circuit affirmed. *Id.* at 99. The Supreme Court vacated the judgment and remanded the case on the ground that granting summary judgment was inappropriate because further factual findings as to whether the two water bodies at issue were meaningfully distinct were necessary. *Id.* In its decision, the Supreme Court addressed three key questions. First, it asked whether the definition of "discharge of a pollutant" in Section 502 of the Clean Water Act (33 U.S.C. § 1362(12)) reaches point sources that do not themselves generate pollutants. The Court held that it does. *Miccosukee*, 541 U.S. at 105.

Second, the Court addressed whether "all the water bodies that fall within the Act's definition of 'navigable waters' (that is, all 'the waters of the United States, including the territorial seas,' § 1362(7)) should be viewed unitarily for purposes of NPDES permitting requirements." *Id.* at 105-06. The Court declined to defer to the EPA's "longstanding" view to that effect because "the Government d[id] not identify any administrative documents in which [the] EPA ha[d] espoused that position"; in point of fact, "the agency once reached the opposite conclusion." *Id.* at 107. As the dissent points out, the Supreme Court suggested that it took a dim view of the unitary-waters reading of the CWA, stating that:

73

"several NPDES provisions might be read to suggest a view contrary to the unitary-waters approach"; "[t]he 'unitary waters' approach could also conflict with current NPDES regulations"; and "[t]he NPDES program . . . appears to address the movement of pollutants among water bodies, at least at times." *Id.* at 107-08. But the Court also seemed to acknowledge that the statute could be interpreted in different ways:

> It may be that construing the NPDES program to cover such transfers would therefore raise the costs of water distribution prohibitively, and violate Congress' specific instruction that "the authority of each State to allocate quantities of water within its jurisdiction shall not be superseded, abrogated or otherwise impaired" by the Act. § 1251(g). On the other hand, it may be that such permitting authority is necessary to protect water quality, and that the States or EPA could control regulatory costs by issuing general permits to point sources associated with water distribution programs. *See* 40 CFR §§ 122.28, 123.25 (2003).

*Id.* at 108. Ultimately, the Court declined to rule on the unitary-waters theory because the parties did not raise the argument before the Eleventh Circuit or in their briefs supporting and opposing the Court's grant of *certiorari*. Instead, the Court did no more than note that unitary-waters arguments would be open to the parties on remand. *Id.* at 109.

Third, the Supreme Court addressed whether a triable issue of fact existed as to whether the water transfer at issue was between "meaningfully distinct"

water bodies, and thus required an NPDES permit. The Court held that such a triable issue did exist, and vacated and remanded for further fact-finding. *Id.* at 109-12. The Court stated that if after reviewing the full record, the district court concluded that the water transfer was not between two meaningfully distinct bodies of water, then the District would not need to obtain an NPDES permit in order to operate the pumping facility. *Id.* at 112. Thus, it seems as though the purpose of the remand was (a) to address the parties' unitary-waters arguments as a preliminary legal matter, and (b) to engage in fact-finding necessary to resolve the case if the argument as to unitary-waters did not prevail.

With respect to the unitary-waters interpretation of Section 402, then, *Miccosukee* suggested that a unitary-waters interpretation of the statute was unlikely to prevail because it was not the *best* reading of the statute, but did not conclude that it was an *unreasonable* reading of the statute. By acknowledging the arguments against requiring NPDES permits for water transfers, and noting that unitary-waters arguments would be open to the parties on remand, the Court can be read to have suggested that such arguments are reasonable, even if not, in the Court's view, preferable.

This interpretation of *Miccosukee* is reflected in subsequent case law interpreting that decision. In *Catskill II*, we expressed our view that "*Miccosukee* did no more than note the existence of the [unitary-waters] theory and raise possible arguments against it." 451 F.3d at 83. And in *Friends I*, the Eleventh Circuit concluded, despite its discussion of *Miccosukee*, that the Water Transfers Rule's interpretation of the CWA *is* entitled to *Chevron* deference. *See Friends I*, 570 F.3d at 1217-18, 1225, 1228.

*Friends I* provides further support for the reasonableness of the Rule's interpretation. Like *Miccosukee*, the decision addressed whether the District was required to obtain NPDES permits to conduct certain specified water transfers. *See Friends I*, 570 F.3d at 1214. This time, however, the issue was addressed *after* the EPA had issued the Water Transfers Rule, and the deferential framework of *Chevron* therefore applied. In *Friends I*, the parties did not contest that the donor water bodies (canals from which water was pumped into Lake Okeechobee) and the receiving water body (the lake) were "navigable waters." *Id.* at 1216. Because under *Miccosukee* the NPDES "permitting requirement does not apply unless the bodies of water are meaningfully distinct," the question was therefore "whether moving an existing pollutant from one navigable water body to another is an

76

'addition . . . to navigable waters' of that pollutant." *Id.* at 1216 & n.4 (quoting 33 U.S.C. § 1362(12)). The District argued, based on the "unitary waters theory," that "it is not an 'addition . . . to navigable waters' to move existing pollutants from one navigable water to another." *Id.* at 1217. "An addition occurs, under this theory, only when pollutants first enter navigable waters from a point source, not when they are moved between navigable waters." *Id.*

The Eleventh Circuit agreed. It began its analysis by surveying relevant prior decisions, noting that "[t]he unitary waters theory has a low batting average. In fact, it has struck out in every court of appeals where it has come up to the plate." *Id.* (collecting cases). In the time since those decisions were issued, however, there "ha[d] been a change. An important one. Under its regulatory authority, the EPA ha[d then-]recently issued a regulation adopting a final rule specifically addressing this very question. Because that regulation was not available at the time of the earlier decisions," including *Catskill I*, *Catskill II*, and *Miccosukee*, "they [we]re not precedent against it." *Id.* at 1218. Therefore, the question before the Court was whether to give *Chevron* deference to the Rule. "All that matters is whether the regulation is a reasonable construction of an ambiguous statute." *Id.* at 1219. The cases on which the plaintiffs relied—which

77

included *Catskill I*, *Catskill II*, and *Miccosukee*—were therefore unhelpful because there was then no formal rule to which to apply the *Chevron* framework. "Deciding how best to construe statutory language is not the same thing as deciding whether a particular construction is within the ballpark of reasonableness." *Id.* at 1221.

The court then engaged in a *Chevron* analysis strikingly similar to the one we are tasked with conducting here. As to the plain meaning of the statutory language, the Eleventh Circuit determined that the key question was whether "'to navigable waters' means to *all* navigable waters as a singular whole." *Id.* at 1223 (emphasis in original). This question could not be resolved by looking to the common meaning of the word "waters," which could be used to refer to several different bodies of water collectively (e.g., "the waters of the Gulf coast") or to a single body of water (e.g., "the waters of Mobile Bay"). *Id*. After examining the statutory language in the context of the Clean Water Act as a whole, the court then noted that Congress knew how to use the term "any navigable waters" in other statutory provisions when it wanted to protect individual water bodies (even though it at times used the unmodified term "navigable waters" for the same meaning), and determined that the Act's goals were so broad as to be

unhelpful in answering this difficult, specific question. *See id.* at 1224-27. The

court therefore concluded that the statutory language was ambiguous, and that

the EPA's unitary-waters reading of Section 402 was reasonable. *Id.* at 1227-28.

The Court of Appeals explained, using an analogy we think is applicable to in

the case before us:

> Sometimes it is helpful to strip a legal question of the contentious policy interests attached to it and think about it in the abstract using a hypothetical. Consider the issue this way: Two buckets sit side by side, one with four marbles in it and the other with none. There is a rule prohibiting "any addition of any marbles to buckets by any person." A person comes along, picks up two marbles from the first bucket, and drops them into the second bucket. Has the marble-mover "add[ed] any marbles to buckets"? On one hand, as the [plaintiffs] might argue, there are now two marbles in a bucket where there were none before, so an addition of marbles has occurred. On the other hand, as the [District] might argue and as the EPA would decide, there were four marbles in buckets before, and there are still four marbles in buckets, so no addition of marbles has occurred. Whatever position we might take if we had to pick one side or the other we cannot say that either side is unreasonable.

*Id.* at 1228 (first brackets in original).

Following *Friends I*, the Eleventh Circuit in *Friends II* dismissed several

petitions for direct appellate review of the Water Transfers Rule on the grounds

that the Court lacked subject-matter jurisdiction under the Act (specifically, 33

U.S.C. §§ 1369(b)(1)(E), (F)) and could not exercise hypothetical jurisdiction.

*Friends II*, 699 F.3d at 1286-89. In the course of doing so, the Eleventh Circuit

clarified its holding in *Friends I* that "the water-transfer rule was a reasonable interpretation of an ambiguous provision of the Clean Water Act," and therefore passed muster under *Chevron*'s deferential standard of review. *Id.* at 1285. We are in general agreement with the *Friends I* approach, and in complete agreement with its conclusion that we must give *Chevron* deference to the EPA's interpretation of Section 402 of the Act in the Water Transfers Rule.[33]

---

[33] The Supreme Court's more recent decision in *Los Angeles County Flood Control District v. Natural Resources Defense Council, Inc.*, 133 S. Ct. 710 (2013), on which some of the plaintiffs and the dissent rely, does not suggest that the Water Transfers Rule's interpretation of the Clean Water Act is or is not reasonable. In *Los Angeles County*, the Supreme Court held that "the flow of water from an improved portion of a navigable waterway into an unimproved portion of the very same waterway does not qualify as a discharge of pollutants under the CWA," reasoning that, "[u]nder a common understanding of the meaning of the word 'add,' no pollutants are 'added' to a water body when water is merely transferred between different portions of that water body." *Id.* at 713. This conclusion is consistent with both a unitary-waters reading of the CWA (under which a discharge of a pollutant occurs only when the pollutant is first introduced to any of the navigable waters), and with a non-unitary-waters reading (under which a discharge of a pollutant occurs only when a pollutant is first introduced from a particular navigable water to another, and not when it moves around within the same navigable water).

The Supreme Court's opinion in *Los Angeles County* does not discuss the definition of "navigable waters," nor does it imply a definition of that term. True, the Supreme Court characterized *Miccosukee* as holding that a "water transfer would count as a discharge of pollutants under the CWA only if the canal and the reservoir were 'meaningfully distinct water bodies.'" *Id.* (quoting *Miccosukee*, 541 U.S. at 112). But this cannot change what the *Miccosukee* majority opinion actually said, and, as we discussed above, *Miccosukee* indicates that a unitary-waters reading may be "within the ballpark of reasonableness." *See Friends I*, 570 F.3d at 1221. Ultimately, *Los Angeles County* does not provide support for either side of the debate over the unitary-waters theory encapsulated in the Water Transfers Rule.

Another factor favoring the reasonableness of the Water Transfers Rule's interpretation of the Clean Water Act is that compliance with an NPDES permitting scheme for water transfers is likely to be burdensome and costly for permittees, and may disrupt existing water transfer systems. For instance, several intervenor-defendant water districts assert that it could cost an estimated $4.2 billion to treat just the most significant water transfers in the Western United States, and that obtaining an NPDES permit and complying with its conditions could cost a single water provider hundreds of millions of dollars. *See* Water Districts Br. 21. Similarly, intervenor-defendant New York City submits that if it is not granted the permanent variances it has requested in its most recent permit application, it will be forced to construct an expensive water-treatment plant, *see* NYC Br. 22-23, 28-30, 35-37, 55-56**,** and *amicus curiae* the State of California argues that requiring NPDES permits would put a significant financial and logistical strain on the California State Water Project, *see* State of California *Amicus* Br. 16. Further, *amici curiae* the American Farm Bureau Federation and Florida Farm Bureau Federation argue that the invalidation of the Water Transfers Rule would (i) throw the status of agricultural water-flow plans into doubt, and (ii) require state water agencies to increase revenues to pay for permits for levies and dams,

which they would likely accomplish by raising agricultural and property taxes, and which in turn would raise farmers' costs and hurt their international economic competitiveness. *See* Farmer *Amici* Br. 2-3. The potential for such disruptive results, if accurate, would provide further support for the EPA's decision to interpret the statutory ambiguity at issue so as not to require NPDES permits for water transfers.[34]

Yet another consideration supporting the reasonableness of the Water Transfers Rule is that several alternatives could regulate pollution in water transfers even in the absence of an NPDES permitting scheme, including: nonpoint source programs;[35] other federal statutes and regulations (like the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*, and the Surface Water Treatment Rule, 40 C.F.R. § 141.70 *et seq.*); the Federal Energy Regulatory Commission's regulatory scheme for non-federal hydropower dams; state permitting programs that have more stringent requirements than the NPDES program, *see* 33 U.S.C.

---

[34] The district court made no findings of fact in the course of answering the purely legal question before it, and we express no view as to the likelihood that requiring NPDES permits for water transfers would lead to the results identified above. We note only that concerns that such results might arise are plausible and could support the EPA's interpretation of the Clean Water Act in the Water Transfers Rule.

[35] Examples of nonpoint source programs are state water quality management plans and total maximum daily loads (commonly called "TMDLs"). *See* EPA Br. 30; EPA Reply Br. 19-20; NYC Br. 51-53; Western States Br. 37-38; Western Parties J. Reply 25-28.

§ 1370(1); other state authorities and laws; interstate compacts; and international treaties.[36] The availability of these regulatory alternatives further points towards the reasonableness of the EPA's interpretation of the Act in the Water Transfers Rule.

With respect to other state authorities and laws, the Act "recognizes that states retain the primary role in planning the development and use of land and water resources, allocating quantities of water within their jurisdictions, and regulating water pollution, as long as those state regulations are not less stringent than the requirements set by the CWA." *Catskill II*, 451 F.3d at 79 (citations omitted). To these ends, states can rely on statutory authorities at their disposal for regulating the potentially negative water quality impacts of water transfers.[37] States can also enforce water quality standards through their

_____

[36] One example of such a treaty is the Boundary Waters Treaty of 1909, *Treaty Between the United States and Great Britain Relating to Boundary Waters, and Questions Arising Between the United States and Canada*, Int'l Joint Comm'n, art. IV (May 13, 1910), *available at* http://www.ijc.org/en_/BWT (last visited July 18, 2016), *archived at* https://perma.cc/M3F3-NWLT. *See* Western States Br. 46-47.

[37] For instance, the States and their agencies generally have broad authority to prevent the pollution of the States' waters. Colorado's Water Quality Control Commission is authorized to promulgate regulations providing for mandatory or prohibitory precautionary measures concerning any activity that could cause the quality of any state waters to be in violation of any water quality standard. *See, e.g.,* Colo. Rev. Stat. §§ 25-8-205(1)(c), 25-8-503(5). In addition, New Mexico's State Engineer is authorized to deny a water transfer permit if he or she finds that the transfer will be detrimental to the

certification authority under Section 401 of the Clean Water Act, which requires that applicants for federal licenses or permits obtain a state certification that any discharge of pollutants will comply with the water-quality standards applicable to the receiving water body. *See* 33 U.S.C. § 1341; *S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 386 (2006); *PUD No. 1*, 511 U.S. at 712.

States have still more regulatory tools at their disposal. State agencies may be granted specific authority to address particular pollution or threats of pollution. For example, in New York, the NYSDEC is authorized and directed to promulgate rules to protect the recreational uses—such as trout fishing and

State's public welfare (for example, by jeopardizing water quality). *See* N.M. Stat. Ann. § 72-5-23; *Stokes v. Morgan*, 680 P.2d 335, 341 (N.M. 1984) (suggesting that the State Engineer could deny a permit to change the point of diversion and place of use of groundwater rights where "intrusion of poor quality water could result in impairment of existing rights"). In California, interbasin transfers are already subject to water quality regulation separate from the federal NPDES permitting authority by California's State Water Resources Control Board and the State's regional water quality control boards. *See* Cal. Water Code §§ 1257-58, 13263; *Lake Madrone Water Dist. v. State Water Res. Control Bd.*, 209 Cal.App.3d 163, 174, 256 Cal. Rptr. 894, 901 (1989) (noting that California "may enact more stringent controls on discharges than are required by the [Clean Water Act]"); *United States v. State Water Res. Control Bd.*, 182 Cal. App. 3d 82, 127-30, 149-52, 227 Cal. Rptr. 161, 185-87, 200-02 (1986) (California's State Water Resources Control Board can reexamine previously issued water-rights permits to address newly discovered water-quality matters). And the State of New York's Department of Environmental Conservation (the "NYSDEC") enforces its own water quality standards outside of the NPDES permitting program. *See, e.g.,* N.Y. Envtl. Conserv. Law §§ 15-0313(2) (the NYSDEC is authorized to modify water quality standards and to reclassify the State's waters), 17-0301 (the NYSDEC has authority to classify waters and apply different standards of quality and purity to waters in different classes), 17-0501 (general prohibition on water pollution).

canoeing—of waters affected by certain large reservoirs such as the Schoharie Reservoir. *See* N.Y. Envtl. Conserv. Law §§ 15-0801, 15-0805 (McKinney 2008). And as discussed above, states likely can also bring common-law nuisance suits to enjoin and abate pollution. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 487 (1987) (the common law of the state in which the point source is located can provide a basis for a legal challenge to an interstate discharge or transfer).

Lastly, although water transfers apparently do not often have interstate or international effects, the States and the Federal Government can address any such effects through interstate compacts or treaties,[38] as well as Section 310 of the Clean Water Act, which authorizes an EPA-initiated procedure for abating international pollution, 33 U.S.C. § 1320. The existence of these available regulatory alternatives suggests that exempting water transfers from the NPDES permitting program would not necessarily defeat the fundamental water-quality aims of the Clean Water Act, which further counsels in favor of the reasonableness of the Water Transfers Rule. We need not now evaluate the effectiveness of such alternatives; we note only that their existence suggests that the Rule is reasonable.

---

[38] *See supra* note 36.

The plaintiffs advance several other arguments against the reasonableness of the Water Transfers Rule's interpretation of the Clean Water Act. Ultimately, none persuades us that the Rule is an unreasonable interpretation of the Clean Water Act.

The plaintiffs first argue, as we have noted, that the Water Transfers Rule arises out of an unreasonable reading of the Act because it subverts the main objective of the Clean Water Act, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), by allowing "the transfer of water from a heavily polluted, even toxic, water body to one that was pristine," *Catskill II*, 451 F.3d at 81. While this is a powerful argument against the EPA's position, we are not convinced that it establishes that the Water Transfers Rule is an unreasonable interpretation of the Clean Water Act, which is "among the most complex" of federal statutes and "balances a welter of consistent and inconsistent goals." *Catskill I*, 273 F.3d at 494. Congress's overarching goal in passing the Act does not imply that the EPA could not accommodate some of the compromises and other policy concerns embedded in the statute in promulgating the Water Transfers Rule.

Some plaintiffs also argue that the EPA's interpretation of Section 402 contained in the Water Transfers Rule is unreasonable in light of the EPA's interpretation of Section 404. They point out that the EPA has interpreted the phrase "discharge of dredged . . . material into the navigable waters" from Section 404 to require a permit when dredged material is moved from one location to another within the same water body, regardless of whether the dredged material is ever removed from the water. *See* 33 U.S.C. § 1344(a); 40 C.F.R. § 232.2. They argue that if moving dredged material from one part of a water body to another part of that same water body is an "addition . . . into . . . the waters of the United States," *see* 40 C.F.R. § 232.2, then it is unreasonable to say that the movement of heavily polluted water from one water body into a pristine water body is not also an "addition" to "waters" that would require an NPDES permit.

But Section 404 contains different language that suggests that a different interpretation of the term "addition" is appropriate in analyzing that section. Section 404 concerns "dredged material," which, as the EPA pointed out in the Water Transfers Rule, "by its very nature comes from a waterbody." 73 Fed. Reg. at 33,703. As the Fifth Circuit has observed, in the context of Section 404, one

cannot reasonably interpret the phrase "addition . . . into . . . the waters of the United States" to refer only to the addition of dredged material from the "outside world" —that is, from outside the "waters of the United States"—because the dredged material comes from within the waters of the United States itself.  *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 924 n.43 (5th Cir. 1983). Interpreting Section 404 so as not to require permits for dredged material already present in "the waters of the United States" would effectively mean that dredged material would *never* be subject to Section 404 permitting, eviscerating Congress's intent to establish a dredge-and-fill permitting system.  By contrast, Section 402 concerns a much broader class of pollutants than Section 404, and the Water Transfers Rule's interpretation of Section 402 would not require the dismantling of existing NPDES permitting programs.  The EPA can therefore reasonably interpret what constitutes an "addition" into "the waters of the United States" differently under each provision.[39]

---

[39] In any event, there is no requirement that the same term used in different provisions of the same statute be interpreted identically.  *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574-76 (2007).  Indeed, "[i]t is not impermissible under *Chevron* for an agency to interpret [the same] imprecise term differently in two separate sections of a statute which have different purposes."  *Abbott Labs. v. Young*, 920 F.2d 984, 987 (D.C. Cir. 1990), *cert. denied sub nom. Abbott Labs. v. Kessler*, 502 U.S. 819 (1991); *see also Aquarius Marine Co. v. Peña*, 64 F.3d 82, 88 (2d Cir. 1995) (an agency has "discretion to undertake independent interpretations of the same term in different statutes").

Finally, we think that the plaintiffs' reliance on *Clark v. Martinez*, 543 U.S.

371, 386-87 (2005), and *Sorenson v. Sec'y of the Treasury of U.S.*, 475 U.S. 851, 860

(1986), is misplaced. In *Clark*, the Supreme Court cautioned against "the

dangerous principle that judges can give the same statutory text different

meanings in different cases." *Clark*, 543 U.S. at 386. But that cautionary

statement referred to an interpretation of a specific subsection of the Immigration

and Nationality Act that would give a phrase one meaning when applied to the

first of three categories of aliens, and another meaning when applied to the

second of those categories. *See id.* at 377-78, 386. It does not follow that an

agency cannot interpret similar, ambiguous statutory language in one section of

a statute differently than similar language contained in another, entirely distinct

section. In *Sorenson*, the Supreme Court noted in *dicta* that there is a presumption

that "identical words used in different parts of the same act are intended to have

the same meaning," 475 U.S. at 860 (quoting *Helvering v. Stockholms Enskilda Bank*,

293 U.S. 84, 87 (1934)). But this is no more than a presumption. It can be

rebutted by evidence that Congress intended the words to be interpreted

differently in each section, or to leave a gap for the agency to fill. *See Duke*, 549

U.S. at 575-76 ("There is, then, no effectively irrebuttable presumption that the

89

same defined term in different provisions of the same statute must be interpreted identically." (internal quotation marks omitted)).  Here, there is evidence that Congress gave the EPA the discretion to interpret the terms "addition" and the broader phrases "addition . . . to navigable waters" (Section 402) and "addition . . . into . . . the waters of the United States" (40 C.F.R. § 232.2, defining "discharge of dredged material" in Section 404) differently.

*         *         *

In sum, the Water Transfers Rule's interpretation of the Clean Water Act— which exempts water transfers from the NPDES permitting program—is supported by several reasonable arguments.  The EPA's interpretation need not be the "only possible interpretation," nor need it be "the interpretation deemed *most* reasonable."  *Entergy*, 556 U.S. at 218 (emphasis in original).  And even though, as we note yet again, we might conclude that it is not the interpretation that would most effectively further the Clean Water Act's principal focus on water quality, it is reasonable nonetheless.  Indeed, in light of the potentially serious and disruptive practical consequences of requiring NPDES permits for water transfers, the EPA's interpretation here involves the kind of "difficult policy choices that agencies are better equipped to make than courts." *Brand X*,

545 U.S. at 980.  Because the Water Transfers Rule is a reasonable construction of the Clean Water Act supported by a reasoned explanation, it survives deferential review under *Chevron*, and the district court's decision must therefore be reversed.

## **CONCLUSION**

For the foregoing reasons, we defer under *Chevron* to the EPA's interpretation of the Clean Water Act in the Water Transfers Rule.  Accordingly, we reverse the judgment of the district court and reinstate the challenged rule.

CHIN, *Circuit Judge*, dissenting:

I respectfully dissent.

The Clean Water Act (the "Act") prohibits the "discharge of any pollutant by any person" from "any point source" to "navigable waters" of the United States, without a permit. 33 U.S.C. §§ 1311(a), 1362(12)(A). The question presented is whether a transfer of water containing pollutants from one body of water to another -- say, in upstate New York, from the more-polluted Schoharie Reservoir through the Shandaken Tunnel to the less-polluted Esopus Creek -- is subject to these provisions.

The United States Environmental Protection Agency ("EPA") takes the position that such a transfer is not covered, on what has been called the "unitary waters" theory -- all water bodies in the United States, that is, all lakes, rivers, streams, etc., constitute a single unit, and therefore the transfer of water from a pollutant-laden water body to a pristine one is not an "addition" of pollutants to the "navigable waters" of the United States because the pollutants are already present in the overall single unit. Consequently, in a rule adopted in 2008 (the "Water Transfers Rule"), EPA determined that water transfers from one water body to another, without intervening industrial, municipal, or commercial

activity, were excluded from the permitting requirements of the National Pollutant Discharge Elimination System ("NPDES"), even if dirty water was transferred from a polluted water body to a clean one. The majority holds that the Water Transfers Rule is a reasonable interpretation of the Act. I disagree.

As the majority notes, we evaluate EPA's interpretation of the Act under the two-step framework of *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984). At step one, we consider whether Congress has "unambiguously expressed" its intent. *Riverkeeper Inc. v. EPA*, 358 F.3d 174, 184 (2d Cir. 2004). If so, we "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. If the statute is "silent or ambiguous," however, we turn to step two and determine "'whether the agency's answer is based on a permissible construction of the statute,' which is to say, one that is 'reasonable,' not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Riverkeeper*, 358 F.3d at 184 (quoting *Chevron*, 467 U.S. at 843-44).

I would affirm the district court's decision to vacate the Water Transfers Rule. First, I would hold at *Chevron* step one that the plain language and structure of the Act is unambiguous and clearly expresses Congress's intent to prohibit the transfer of polluted water from one water body to another distinct

2

water body without a permit. In my view, Congress did not intend to give a pass to interbasin transfers of dirty water, and excluding such transfers from permitting requirements is incompatible with the goal of the Act to protect our waters.[1] Second, prior decisions of this Court and the Supreme Court make clear that the unitary waters theory is inconsistent with the plain and ordinary meaning of the text of the Act and its purpose. Third, even assuming there is any ambiguity, I would hold at *Chevron* step two that the Water Transfers Rule is an unreasonable, arbitrary, and capricious interpretation of the Act. Accordingly, I dissent.

I

I begin with the language of the Act, its structure, and its purpose.

**A.**    *The Statutory Language*

The Act provides that "the discharge of any pollutant by any person shall be unlawful," 33 U.S.C. § 1311(a), except to the extent allowed by other

---

[1]    The term "interbasin transfer" refers to an artificial or man-made conveyance of water between two distinct water bodies that would not otherwise be connected. *See Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of N.Y.*, 273 F.3d 481, 489-93 (2d Cir. 2001) ("*Catskill I*"); *see also* 40 C.F.R. § 122.3(i) ("water transfer" is "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use").

provisions, including, for example, those provisions establishing the NPDES permit program, 33 U.S.C. § 1342.

The Act defines "*discharge* of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12)(A) (emphasis added).  It defines "*pollutant*" to include solid, industrial, agricultural, and biological waste.  *Id.* § 1362(6) (emphasis added).  It defines "*navigable waters*" as "the waters of the United States, including the territorial seas."  *Id.* § 1362(7) (emphasis added).  And it defines a "*point source*" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged."  *Id.* § 1362(14) (emphasis added).  The Act does not define the word "*addition*."

In my view, the plain language of the Act makes clear that the permitting requirements apply to water transfers from one distinct body of water through a conveyance to another.  As noted, the Act prohibits "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12)(A).  The transfer of contaminated water from a more-polluted water body through a

4

conveyance, such as a tunnel, to a distinct, less-polluted water body is the "addition" of a pollutant (contained in the contaminated water) to "navigable waters" (the less-polluted water body) from a "point source" (the conveyance). In the context of this case, as we held in *Catskill I*:

> Here, water is artificially diverted from its natural course and travels several miles from the [Schoharie] Reservoir through Shandaken Tunnel to Esopus Creek, a body of water utterly unrelated in any relevant sense to the Schoharie Reservoir and its watershed. No one can reasonably argue that the water in the Reservoir and the Esopus are in any sense the "same," such that "addition" of one to the other is a logical impossibility. When the water and the suspended sentiment therein passes from the Tunnel into the Creek, an "addition" of a "pollutant" from a "point source" has been made to a "navigable water," and the terms of the statute are satisfied.

273 F.3d at 492.

EPA contends that such a transfer of contaminated water, from a polluted body of water to a distinct and pristine one, is not an "addition" because all the waters of the United States are to be "considered collectively," EPA Br. at 2, that is, because the polluted and pristine bodies of water are both part of the waters of the United States and all the waters of the United States are considered to be one unit, the transfer of pollutants from one part of the unit to another part is not an "addition." I do not believe the words of the Act can be so interpreted.

5

The critical words for our purposes are "addition" and "navigable waters." I take them in reverse order.

**1.** *"Navigable Waters"*

EPA's position -- accepted by the majority -- requires us to add words to the Act, as we must construe "navigable waters" to mean "*all* the navigable waters of the United States, considered *collectively*." *Contra Dean v. United States*, 556 U.S. 568, 572 (2009) (courts must "ordinarily resist reading words or elements into a statute that do not appear on its face") (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)).

EPA also argues that if Congress had intended the NPDES permitting requirements to apply to individual water bodies, it would have inserted the word "any" before "navigable waters." *See* 33 U.S.C. § 1362(12)(A) ("any addition of any pollutant to navigable waters from any point source"). This interpretation is flawed, for the use of the plural "waters" obviates the need for the word "any." The use of the plural "waters" indicates that Congress was referring to individual water bodies, not one collective water body. The Supreme Court addressed this precise issue in its discussion of "the waters of the United States" in *Rapanos v. United States.* There the Court considered the issue of

6

whether § 1362(7)'s definition of "navigable waters" meant "waters of the United States," and the Court squarely held that "waters" referred to "individual bodies," not one collective body:

> But "the waters of the United States" is something else. The use of the definite article ("the") and the plural number ("waters") shows plainly that § 1362(7) *does not refer to water in general*. In this form, "the waters" refers more narrowly to water "[a]s found in streams and *bodies* forming geographical features such as oceans, rivers, [and] lakes," or the flowing or moving masses, as of waves or floods, making up such streams or *bodies*." Webster's New International Dictionary 2882.

547 U.S. 715, 732 (2006) (alterations in original) (emphases added). Hence, the Supreme Court concluded the plural form "waters" does not refer to "water in general," but to water *bodies* such as streams, lakes and ponds.[2]

---

[2]  The majority writes that the Supreme Court's holding in *Rapanos* "does not compel the conclusion that the statutory phrase 'navigable waters' is unambiguous because that phrase, unlike the phrase in *Rapanos*, is not limited by a definite article." Op. at 44, n.24. While *Rapanos* may not "compel" that conclusion, it certainly supports it. In *Rapanos*, the Supreme Court was interpreting the same definition of "navigable waters" in operation here, § 1362(7), which defines "navigable waters" as "the waters of the United States." The lack of the word "the" before "navigable waters" in § 1362(12)(A) hardly negates the Supreme Court's holding that the definition of "navigable waters" as found in § 1362(7) does not refer to water in general, but water bodies. Moreover, the existence or non-existence of a definite article before a noun, on its own, has no bearing on the plural or singular nature of a noun. "The" can be used to refer to a particular person or thing or a group. *See* Bryan A. Garner, *Garner's Modern American Usage: The Authority on Grammar, Usage and Style*, 883 (3rd Ed. 2009) ("The definite article can be

7

As the majority acknowledges, the Act contains multiple provisions suggesting that the term "navigable waters" refers to multiple water bodies, not one national collective water body. Op. at 43 (citing 33 U.S.C. §§ 1313(c)(2)(A), (c)(4), 1313(d)(1)(B), 1314(2), 1314(f)(2)(F), 1314(l)(1)(A)-(B), 1342)).[3] Likewise, EPA's own regulations suggest that "navigable waters" refers to individual water bodies. For example, 40 C.F.R. § 122.45(g)(4) regulates intake credits. As the Supreme Court has observed, this regulation is incompatible with the "unitary waters" theory:

> The "unitary waters" approach could also conflict with current NPDES regulations. For example, 40 C.F.R. § 122.45(g)(4)(2003) allows an industrial water user to obtain "intake credit" for pollutants present in the water that it withdraws from navigable waters. When the permit holder discharges the water after use, it does not have to remove pollutants that were in the water before

used to refer to a group <the basketball team> or, in some circumstances, a plural <The ideas just keep on flowing>.").

[3]    There are additional sections in which the term "navigable waters" clearly refers to individual water bodies. *See, e.g.*, 33 U.S.C. §§ 1341 (requiring any applicant for federal license or permit "to conduct any activity, including but not limited to, the construction or operation of facilities which may result in any discharge in the navigable waters" to obtain a state certification that any discharge of pollutants will comply with the *receiving* water body's water-quality standard), 1344(a) (requiring permits for "[d]ischarge into navigable waters at specified disposal sites" by establishing a separate permit program for discharges of "dredged or fill material," which by definition come from water bodies); *see also* 33 U.S.C. §§ 1313(a), (d)(1)(A), 1313(e)(4), 1314(l)(1), (b)(1), (d)(2)(D), (h)(9), (h)(11)(B).

> it was withdrawn.  There is a caveat, however: EPA extends such credit "only if the discharger demonstrates that the intake water is drawn from the same body of water into which the discharge is made."  The NPDES program thus appears to address the movement of pollutants among water bodies, at least at times.

*S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 107-08 (2004).  In all of these instances, the phrase "navigable waters" refers to individual water bodies and not one collective national water body.  Indeed, neither the majority nor the parties have identified a single provision in the Act where "navigable waters" refers to the waters of the United States as a unitary whole.

**2.** *"Addition"*

EPA's interpretation also requires us to twist the meaning of the word "addition."  Because the word "addition" is not defined in the Act, we consider its common meaning.  *See S.D. Warren Co. v. Me. Bd. of Environ. Prot.*, 547 U.S. 370, 376 (2006)  (in considering the definition of "discharge" in 33 U.S.C. § 1362(12), noting that where a word is "neither defined in the statute nor a term of art, we are left to construe it 'in accordance with its ordinary or natural meaning'" (citing *FDIC v. Meyer*, 510 U.S. 471, 476 (1994))); *see also Perrin v. United States*, 444 U.S. 37, 42 (1979) (words should be interpreted according to their "ordinary, contemporary, common meaning").

The ordinary meaning of "addition" is "the result of adding: anything added: increase, augmentation." *Webster's Third New International Dictionary of the English Language Unabridged* 24 (1968); *see also Webster's New World Dictionary of the American Language* 16 (2d College ed. 1970 and 1972) ("a joining of a thing to another thing"). Transferring water containing pollutants from a polluted water body to a clean water body is "adding" something to the latter; there is an "addition" -- an increase in the number of pollutants in the second water body. In this context, "addition" means adding a pollutant to "navigable waters" when that pollutant would not otherwise have been in those "navigable waters." Words should be given their "contextually appropriate ordinary meaning," Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70 (2012), and the context here is a statute intended to eliminate water pollution discharges. *See Catskill I*, 273 F.3d at 486. That context makes clear that the word "addition" encompasses an increase in pollution caused by an interbasin transfer of water.

The plain words of the statute thus make clear that Congress did not intend to except water transfers from §§ 1311 and 1362 of the Act.

10

**B.**     *The Structure of the Act*

Congress's intent to require a permit for interbasin water transfers is even clearer when we consider the statutory language in light of the Act's structure. In determining whether Congress has spoken to the precise question at issue, we consider the words of the statute in "their context and with a view to their place in the overall statutory scheme," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000), because "the meaning -- or ambiguity -- of certain words or phrases may only become evident when placed in context," *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Brown & Williamson*, 529 U.S. at 133); *see also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2442 (2014) ("reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole'" (citations omitted)); *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989) (a "fundamental canon of statutory construction" is "that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").

Here, EPA's "unitary waters" theory, when considered in the context of other provisions of the Act, contravenes Congress's unambiguous intent to

11

subject interbasin transfers to permitting requirements and is therefore unreasonable. *See King*, 135 S. Ct. at 2489 (a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law" (citing *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988))).

First, the Water Transfers Rule creates an exemption to permitting requirements, in violation of the canon *expressio unius est exclusio alterius*, which cautions against finding implied exceptions where Congress has created explicit ones. Section 1311(a) of the Act prohibits "[t]he discharge of any pollutant by any person." 33 U.S.C. § 1311(a). The Supreme Court has held that "*every* point source discharge" is covered by the Act:

> Congress' intent in enacting the [1972] Amendments [to the Federal Water Pollution Control Act] was clearly to establish an all-encompassing program of water pollution regulation. *Every* point source discharge is prohibited unless covered by a permit, which directly subjects the discharger to the administrative apparatus established by Congress to achieve its goals. The "major purpose" of the Amendments was clearly to "establish a *comprehensive* long-range policy for the elimination of water pollution." S. Rep. No. 92-414, at 95, 2 Leg. Hist. 1511 (emphasis supplied). No Congressman's remarks

12

on the legislation were complete without reference to the "comprehensive" nature of the Amendments.

*See City of Milwaukee v. Illinois*, 451 U.S. 304, 318 (1981).

Congress created specific exceptions to the prohibition on the discharge of pollutants, as § 1311(a) bans such discharges "[e]xcept as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344." 33 U.S.C. § 1311(a). These include specific exemptions to the NPDES permitting requirements for, *e.g.*, return flows from irrigated agriculture, 33 U.S.C. § 1342(l)(1), stormwater runoff, 33 U.S.C. § 1342(l)(2), and discharging dredged or fill material into navigable waters, 33 U.S.C. § 1344(a). Congress did not create an exception for interbasin water transfers.

It is well-settled that when exceptions are explicitly enumerated, courts should not infer additional exceptions. *See Hillman v. Maretta*, 133 S. Ct. 1943, 1953 (2013) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of contrary legislative intent." (citing *Andrus v. Glover Constr., Co.*, 446 U.S. 608, 616-617 (1980))). This prohibition against implying exceptions has been applied to the Act's permitting requirements. *See NRDC v. Costle*, 568 F.2d 1369, 1377 (D.C. Cir. 1977) ("The wording of the statute, legislative history and

precedents are clear: the EPA Administrator does not have authority to except categories of point sources from the permit requirements of § [1342]"); *Nw. Envir. Advocates v. EPA*, 537 F.3d 1006, 1021-22 (9th Cir. 2008) (EPA may not "exempt certain categories of discharge from the permitting requirement"); *N. Plains Res. Council v. Fidelity Exploration & Dev. Co.*, 325 F.3d 1155, 1164 (9th Cir. 2003) ("Only Congress may amend the CWA to create exemptions from regulation."). Defendants' position that all water transfers between water bodies are exempt from § 1342 permitting requirements is a substantial exemption that Congress did not create.

Second, the Act also sets forth a specific plan for individual water bodies. The Act requires States to establish water-quality standards for each distinct water body within its borders. *See* 33 U.S.C. § 1313(c)(1), (2)(A). To establish water-quality standards, a State must designate a use for every waterway and establish criteria for "the amounts of pollutants that may be present in [those] water bodies without impairing" their uses. *Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 14 (1st Cir. 2012) (citing 33 U.S.C. § 1313(c)(2)(A)). The NPDES permit program is "the primary means" by which the Act seeks to achieve its water-protection goals. *Arkansas v. Oklahoma*,

503 U.S. 91, 101-02 (1992).  The NPDES program covers all "point sources," including "any pipe, ditch, channel, [or] tunnel," 33 U.S.C. § 1362(14), and a broad range of pollutants, including chemicals, biological materials, rock, and sand, *id.* § 1362(6).

This carefully designed plan to fight water pollution would be severely undermined by an EPA-created exception for water transfers.  A State's efforts to control water-quality standards in its individual lakes, rivers, and streams would be disrupted if contaminated water could be transferred from a polluted water body to a pristine one without a NPDES permit.  It is hard to imagine that Congress could have intended such a broad and potentially devastating exception.  Indeed, exempting water transfers from the NPDES program would undermine the ability of downstream States to protect themselves from the pollution generated by upstream States.  The NPDES program provides a procedure for resolving disputes between States over discharges. *See Upper Blackstone Water Pollution Abatement Dist.,* 690 F.3d at 15 (citing *City of Milwaukee,* 451 U.S. at 325-26).  When a State applies for a permit that may affect the water quality of a downstream State, EPA must notify the applying State and the downstream State.  If the downstream State determines

15

that the discharge "will violate its water quality standards, it may submit its objections and request a public hearing." *Id.* If water transfers are exempt from NPDES requirements, the ability of downstream States to protect themselves from upstream states sending their pollution across the border will be severely curtailed.[4]

The City and certain of the States argue that subjecting water transfers to permitting requirements will be extremely burdensome. As we have repeatedly recognized, however, there is ample flexibility in the NPDES permitting process to address dischargers' concerns. *See Catskill Mountains v. EPA*, 451 F.3d 77, 85-86 (2d Cir. 2006) (*"Catskill II"*); *see also Nw. Envtl.*, 537 F.3d at 1010 ("Obtaining a permit under the CWA need not be an onerous process.").

---

[4]     Downstream states would have to resort to common law nuisance suits in the courts of the polluting state, instead of addressing permit violations with EPA. As the district court points out, "EPA never explains how states, post Water Transfers Rule, can address interstate pollution effects 'through their WQS [water quality standards] and TMDL [total maximum daily loads] programs' or 'pursuant to state authorities preserved by section 510,' given that states do not have authority to require other states to adhere to effluent limitations or state-based regulations. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 490 (1987)." *Catskill Mountains Chapter of Trout Unlimited v. U.S. E.P.A.*, 8 F. Supp. 3d 500, 552 (2014). Indeed, at oral argument before the district court, counsel for the State of Colorado conceded that a downstream State's only remedy for interstate pollution of this sort is a common-law nuisance suit and "drink[ing] dirty water until this case makes its way up to the courts." *Id.* at 553. This cannot be what Congress intended.

16

The draft permit issued in this case allows for variable turbidity level restrictions by season and exemptions from the limitations in times of drought to remedy emergency threats or threats to public health or safety. *Catskill II,* 451 F.3d at 86. Point source operators can also seek a variance from limits. *See* 40 C.F.R. § 125.3(b).

In addition, much of the concern over water transfers involved agricultural use, but water diversions from a "navigable water" for agricultural use direct water *away* from a "navigable water," and thus do not trigger the need for a § 402 permit. Waters returning to a "navigable water" which are "agricultural stormwater discharges" and "return flows from irrigated agriculture" are specifically exempted from the statutory definition of "point source." 33 U.S.C. § 1362(14); *see also* 33 U.S.C. § 1342(l) (exempting "discharges composed entirely of return flows from irrigated agriculture" from permitting requirements). Thus, the catastrophic results of applying NPDES permits to water transfers bemoaned by appellants are exaggerated.[5]

---

[5] In addition, general permits can be issued to "an entire class of hypothetical dischargers in a given geographic region," and thus covered discharges can commence automatically without an individualized application process. *Nw. Envtl.,* 537 F.3d at 1011 (citations omitted); *see* 40 C.F.R. § 122.28.

Third, as discussed above, Congress used the phrase "navigable waters" to refer to individual water bodies in numerous provisions of the Act. Another well-settled rule of statutory interpretation holds that the same words in a statute bear the same meaning. *See Sullivan v. Stroop*, 496 U.S. 478, 483 (1990) ("the 'normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning.'" (internal citations omitted)); *Prus v. Holder*, 660 F.3d 144, 147 (2d Cir. 2011) ("the normal rule of statutory construction [is] that identical words used in different parts of the same act are intended to have the same meaning"). When the Act is read as a whole, it is clear that Congress did not intend the phrase "navigable waters" to be interpreted as a single water body because that interpretation is "inconsisten[t] with the design and structure of the statute as a whole." *Utility Air*, 134 S. Ct. at 2442; *see also* Scalia & Garner, *Reading Law* 63 ("A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored.").

Accordingly, in my opinion, the structure and context of the Act show clearly that Congress did not intend to exempt water transfers from the permitting requirements.

## C.    *The Purpose of the Act*

The Act was passed in 1972 to address environmental harms caused by the discharge of pollutants into water bodies.  As the Act itself explains, its purpose was to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a); *accord Miccosukee*, 541 U.S. at 102; *Waterkeeper All., Inc. v. EPA*, 399 F.3d 486, 490-91 (2d Cir. 2005); *see also Catskill I*, 273 F.3d at 486 ("[T]he Act contains the lofty goal of eliminating water pollution discharges altogether.").

The Water Transfers Rule is simply inconsistent with the purpose of the Act and undermines the NPDES permit program.  It creates a broad exemption that will manifestly interfere with Congress's desire to eliminate water pollution discharges.  As the majority acknowledges, water transfers are a real concern.  Artificial transfers of contaminated water present substantial risks to water quality, the environment, the economy, and public health.  If interbasin transfers are not regulated, there is a substantial risk that industrial waste, toxic algae, invasive species, and human and animal contaminants will flow from one water body to another.  Accepting the argument that water transfers are not covered by the Act on the theory that pollutants are not being added but merely

19

moved around surely undermines Congress's intent to restore and maintain the integrity of our waters.  *See* Robert A. Katzmann, *Judging Statutes* 31 (2014) ("The task of the judge is to make sense of legislation in a way that is faithful to Congress's purposes.").

In sum, based on the plain words of §§ 1311 and 1362, the structure and design of the Act, and its overall purpose, I would hold that Congress has "unambiguously expressed" its intent to subject water transfers to the Act's permitting requirements.

## II

As the majority notes, our Court has twice interpreted these precise provisions of the Act as applied to these very facts.  *See Catskill I*, 273 F.3d 484-85; *Catskill II*, 451 F.3d at 79-80.  The decisions are not controlling, however, because EPA had not yet adopted the Water Transfers Rule and we conducted our review under a different deference standard.  *See Catskill I*, 273 F.3d at 490 ("If the EPA's position had been adopted in a rulemaking or other formal proceeding, [*Chevron*] deference *might* be appropriate." (emphasis added)); *Catskill II*, 451 F.3d at 82 ("The City concedes that this EPA interpretation is not entitled to *Chevron* deference.").  Nonetheless, the two decisions are particularly helpful to the

analysis at hand.  Similarly, Supreme Court decisions have also suggested that

EPA's unitary waters theory is inconsistent with the plain wording of the Act.

## A.    *Catskill I and II*

In *Catskill I* and *II*, we conducted our inquiry under *Skidmore v. Swift*

*& Co.*, 323 U.S. 134 (1944), and *United States v. Mead Corp.*, 533 U.S. 218 (2001).  *See*

*Catskill I*, 273 F.3d at 491; *Catskill II*, 451 F.3d at 83 n.5.[6]  Our application of the

*Skidmore/Mead* framework does not imply that we found the Act to be

ambiguous.  Rather, to the contrary, we concluded in *Catskill I* and *II* that the

meaning of the Act was plain and unambiguous.

---

[6]     While we discussed *Mead* and *Skidmore* in *Catskill I* and *II*, we rejected EPA's
position as unpersuasive.  In *Catskill I* we held:

> [C]ourts do not face a choice between *Chevron* deference and
> no deference at all.  Administrative decisions not subject to
> *Chevron* deference may be entitled to a lesser degree of
> deference: the agency position should be followed to the
> extent persuasive.  *See Mead*, 121 S. Ct. at 2175-76 (citing
> *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  For the
> reasons that follow, however, we do not find the EPA's
> position to be persuasive.

273 F.3d at 491.  In *Catskill II*, we observed that because EPA's position was not the
product of a formal rulemaking, the most EPA could hope for was to persuade the court
of the reasonableness of its position under *Skidmore,* a position we did not accept.
*Catskill II*, 451 F.3d at 83 n.5 ("[W]e do not find the ['holistic'] argument persuasive and
therefore decline to defer to the EPA.").

21

**1.** *Skidmore*

Under *Skidmore,* the court applies a lower level of deference to certain agency interpretations and considers "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." *Community Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002); *accord In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 83 (2d Cir. 2004); *see Skidmore*, 323 U.S. at 140. The appropriate level of deference afforded an agency's interpretation of a statute depends on its "power to persuade." *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Unlike *Chevron*, however, *Skidmore* does not require a court to make a threshold finding that the statute is ambiguous before considering the persuasiveness of the agency's interpretation. Instead, *Skidmore* merely supplies the appropriate framework for reviewing agency interpretations that "lack the force of law." *Id.*

As the majority notes, the Supreme Court has never explicitly held that courts must find ambiguity before applying the *Skidmore* framework. While there is some scholarly authority for the proposition that "'the *Skidmore* standard implicitly replicates *Chevron*'s first step,'" Op. at 34 (quoting Kristin E. Hickman

22

& Matthew D. Krueger, *In Search of the Modern Skidmore Standard*, 107 Colum. L. Rev. 1235, 1247 (2007)), the Supreme Court has decided numerous cases under *Skidmore* without finding that a statute's language was ambiguous, *see, e.g., EEOC v. Arabian American Oil*, 499 U.S. 244, 257 (1991) (applying *Skidmore* without finding ambiguity in statute and noting that agency's interpretation "lacks support in the plain language of the statute"); *Whirlpool Corp. v. Marshall*, 445 U.S. 1, 11 (1980) (applying *Skidmore* without finding ambiguity in statute and holding that regulation was permissible after considering statute's "language, structure and legislative history"); *see generally* Richard J. Pierce, Jr., I *Admin. L. Treatise* § 6.4 (5th ed. 2010).

Of course, the Supreme Court did not hold, in either *Skidmore* or *Mead*, that ambiguity was a threshold requirement to applying the framework. *See Mead*, 533 U.S. at 235 (An agency ruling is entitled to "respect proportional to its 'power to persuade,' . . . . Such a ruling may surely claim the merit of its writer's thoroughness, logic, and expertness, and any other sources of weight." (citations omitted)); *Skidmore*, 323 U.S. at 164 ("The weight of [an agency's] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later

pronouncements, and all those factors which give it power to persuade, if lacking

power to control.").  Rather, the *Skidmore*/*Mead* framework adopts a less rigid,

more flexible approach, *see U.S. Freightways Corp. v. Comm'r*, 270 F.3d 1137, 1142

(7th Cir. 2001) (referring to "the flexible approach *Mead* described, relying on . . .

*Skidmore*"), as it presents "a more nuanced, context-sensitive rubric" for

determining the level of deference a court will give to an agency interpretation,

Thomas W. Merrill and Kristin E. Hickman, *Chevron's Domain*, 89 Geo. L.J. 833,

836 (2001); *see also* Pierce, *supra*, § 6.4, at 444 ("The Court has referred to a variety

of factors that can give an agency statement 'power to persuade.' . . .  [N]o single

factor is dispositive . . . .").

Ambiguity in a statute, of course, can be a factor, and in the sliding-

scale analysis of the *Skidmore*/*Mead* framework, the "power to persuade" of an

agency determination can be affected by the clarity -- or lack thereof -- of the

statute it is interpreting.  Indeed, upon applying the *Skidmore*/*Mead* framework, a

court may uphold -- or reject -- an agency interpretation because the

interpretation is consistent with -- or contradicts -- a statute whose meaning is

clear.  *See* Pierce, *supra*, § 6.4, at 443.  Here, we did not defer to the agency's

interpretation of the Act in *Catskill I* and *II,* precisely because the Water Transfers

Rule contravened the plain meaning of the Act.

**2.**      ***The Plain Meaning of the Act***

The majority dismisses the notion that we ruled on the plain

meaning of the Act in *Catskill I* and *II,* asserting that there were only a "few

references to 'plain meaning'" in our decisions.  Op. at 36.  To the contrary,

through both our words and our reasoning, we made clear repeatedly in *Catskill I*

and *II* that the agency's unitary waters theory was inconsistent with the

unambiguous plain meaning of the Act.

In *Catskill I*, we held that defendants' interpretation was

"inconsistent with the *ordinary meaning* of the word 'addition.'"  273 F.3d at 493

(emphasis added).  Specifically, we held that there is an "addition" of a pollutant

into navigable water from the "outside world" -- thus triggering the permitting

requirement -- any time such an "addition" is from "*any place* outside the

particular water body to which pollutants are introduced."  *Id.* at 491 (emphasis

added).  We reasoned that:

> Given the *ordinary meaning* of the [Act]'s text and our
> holding in *Dague*, we cannot accept the *Gorsuch* and
> *Consumers Power* courts' understanding of "addition," at
> least insofar as it implies acceptance of what the *Dubois*

25

court called a "singular entity" theory of navigable waters, in which an addition to one water body is deemed an addition to all of the waters of the United States. . . . We properly rejected that approach in *Dague*. *Such a theory would mean that movement of water from one discrete water body to another would not be an addition even if it involved a transfer of water from a water body contaminated with myriad pollutants to a pristine water body containing few or no pollutants.* Such an interpretation is *inconsistent with the ordinary meaning* of the word "addition."

*Id.* at 493 (emphases added).[7] As a result, we held that "the transfer of water containing pollutants from one body of water to another, distinct body of water is *plainly* an addition and thus a 'discharge' that demands an NPDES permit." *Id.* at 491 (emphasis added). Accordingly, we clearly were relying on the plain meaning of the Act in reaching our conclusion.

We also noted that "[e]ven if we were to conclude that the proper application of the statutory text to the present facts was sufficiently ambiguous to justify reliance on the legislative history of the statute, . . . that source of

---

[7] In *Dague v. City of Burlington*, 935 F.2d 1343 (2d Cir. 1991), the City of Burlington argued that "pollutants would be 'added' only when they are introduced into navigable waters for the first time," *id.* at 1354, an argument mirroring those raised by defendants here. We rejected the contention, in light of "the intended broad reach of § 1311(a)," noting "that the definition of 'discharge of a pollutant' refers to 'any point source' without limitation." *Id.* at 1355 (quoting 33 U.S.C. § 1362(12)). We rejected the assertion that water flowing from a pond to a marsh was not an "addition." *See Catskill I*, 273 F.3d at 492.

legislative intent would not help the City." 273 F.3d at 493. That language

certainly makes clear we concluded the statutory text was *not* ambiguous.

Finally, in the penultimate paragraph of *Catskill I*, we made

absolutely clear that our holding was based on the plain meaning of the statutory

text. We held:

> In any event, none of the statute's broad purposes
> sways us from what we find to be the *plain meaning of its
> text*. . . . Where a statute seeks to balance competing
> policies, congressional intent is not served by elevating
> one policy above the others, particularly where the
> balance struck *in the text* is *sufficiently clear to point to an
> answer*. We find that the *textual* requirements of the
> discharge prohibition in § 1331(a) and the definition of
> "discharge of a pollutant" in § 1362(12) are met here.

*Id.* at 494 (emphases added). [8]

Our analysis in *Catskill II* was similar, as we dismissed defendants'

arguments as merely "warmed-up" versions of those rejected in *Catskill I*, made

no more compelling by EPA's new "holistic" interpretation of the statute. 451

---

[8]      At least one commentator has agreed that we found in *Catskill I* that "the statute's plain meaning was clear." Jeffrey G. Miller, *Plain Meaning, Precedent and Metaphysics, Interpreting the "Addition" Element of the Clean Water Act Offense*, 44 Envtl. L. Rep. News & Analysis 10770, 10792 (2014) ("Although the Second Circuit did not explicitly employ the two-step *Chevron* deference test to EPA's water transfer rule, it left no doubt as to how it would have decided the case under *Chevron*. With regard to the first step, whether the statute is ambiguous, the court in *Catskill I* held that the statute's plain meaning was clear.").

F.3d at 82. We rejected New York City's "'holistic arguments about the allocation of state and federal rights, said to be rooted in the structure of the statute," because, we concluded, they "simply overlook its *plain language*." *Id.* at 84. (emphasis added). We noted our dismissal of the unitary waters theory in *Catskill I* based on the ordinary meaning of the word "addition":

> We also rejected the City's "unitary water" theory of navigable waters, which posits that all of the navigable waters of the United States constitute a single water body, such that the transfer of water from any body of water that is part of the navigable waters to any other could never be an addition. We pointed out that this theory would lead to the *absurd result* that the transfer of water from a heavily polluted, even toxic, water body to one that was pristine via a point source would not constitute an "addition" of pollutants and would not be subject to the [Act]'s NPDES permit requirements. *Catskills I* rejected the "unitary water" theory as inconsistent with the *ordinary meaning* of the word "addition."

*Id.* at 81 (emphasis added) (internal citations omitted). Again, we considered the very interpretation of "navigable waters" proffered in the current appeal and rejected it based on "the plain meaning" of the Act's text. *Id.* at 82.[9]

_____

[9]     The majority suggests that we ruled on the meaning of "addition" based on the plain meaning of the statute without reaching the meaning of "addition . . . *to navigable waters*." Op. at 36-37 (emphasis added) ("We do not . . . think that by referring to the 'plain meaning' of 'addition' in *Catskill I* we were holding that the broader statutory

28

I do not suggest that we are bound by our prior decisions. But in both decisions, we carefully considered the statutory language, and in both decisions, based on the plain wording of the text, we rejected an interpretation of §§ 1311 and 1362 that construes "navigable waters" and "the waters of the United States" to mean a single water body. Hence, we have twice rejected the theory based on the plain language of the Act. That plain language has not changed, and neither should our conclusion as to its meaning.

**B.** *The Supreme Court Precedents*

Finally, although the Supreme Court has not explicitly ruled on the validity of EPA's "unitary waters" theory, it has expressed serious reservations. In *South Florida Water Management District v. Miccosukee Tribe of Indians*, 541 U.S. 1537 (2004), the Court strongly suggested that the theory is not reasonable. First, the Court remanded for fact-finding on whether the two water bodies at issue

---

phrase 'addition . . . to navigable waters' unambiguously referred to a collection of individual 'navigable waters.'" (internal citations and quotations omitted)). It is not possible, however, to define "addition" without defining the object to which the addition is made, as the concepts are inexorably linked. It is clear from our reasoning in *Catskill I* and *II*, that we considered the *entire phrase* in reaching our conclusion. Thus, when we stated "that the discharge of water containing pollutants from one distinct water body to another is an 'addition of [a] pollutant' under the CWA," we could only have meant that the discharge of water containing pollutants constitutes "an 'addition' of [a] pollutant" *to navigable waters*. *Catskill II*, 451 F.3d at 80.

were "meaningfully distinct water bodies." 541 U.S. at 112. That disposition follows from Judge Walker's soup ladle analogy in *Catskill I*: "If one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot (beyond, perhaps, a *de minimis* quantity of airborne dust that fell into the ladle)." 273 F.3d at 492. In *Catskill II*, we noted that such a transfer would be an intrabasin transfer, from one water body back into the same water body, and we then applied the analogy to the facts of this case: "The Tunnel's discharge . . . was like scooping soup from one pot and depositing it in another pot, thereby adding soup to the second pot, an interbasin transfer." 451 F.3d at 81. In *Miccosukee*, the Supreme Court cited the "soup ladle" analogy with approval, and remanded the case to the district court to determine whether the water bodies in question were "two pots of soup, not one." 541 U.S. at 109-10; *see also id*. at 112. If the "unitary waters" theory were valid, however, there would have been no need to resolve this factual question. If all the navigable waters of the United States were deemed one collective national body, there would be no need to consider whether individual water bodies were distinct -- there would be no need to determine whether there were two pots of soup or one.

Second, as previously discussed, the Court observed that "several NPDES provisions might be read to suggest a view contrary to the unitary waters approach." *Id.* at 107. The Court noted that under the Act, states "may set individualized ambient water quality standards by taking into consideration 'the designated uses of the navigable waters involved," thereby affecting local NPDES permits. *Id.* (quoting 33 U.S.C. § 1313(c)(2)(A)). "This approach," the Court wrote, "suggests that the Act protects individual water bodies as well as the 'waters of the United States' as a whole." *Id.*[10]

Subsequent Supreme Court decisions support this reading of *Miccosukee*. In *Los Angeles County Flood Control District v. Natural Resources Defense Council, Inc.,* the Supreme Court held that a water transfer between one portion of a river through a concrete channel to a lower portion of the same river did not trigger a NPDES permit requirement. 133 S. Ct. 710 (2013). The Court observed that "[w]e held [in *Miccosukee*] that th[e] water transfer would count as a discharge of pollutants under the CWA *only if* the canal and the reservoir were 'meaningfully distinct water bodies.'" *Id.* at 713 (emphasis added) (citations omitted). In holding that "the flow of water from an improved portion of a

---

[10] In *Catskill II*, we concluded that "[o]ur rejection of [the unitary waters] theory in *Catskill I* . . . is supported by *Miccosuke*e, not undermined by it." 451 F.3d at 83.

31

navigable waterway into an unimproved portion of the very same waterway does not qualify as a discharge of pollutants under the CWA," *id.*, the Court again suggested that it *would* be a discharge of pollutants if the transfer were between two *different* water bodies.

In *Miccosukee*, the Supreme Court acknowledged the concerns that have been raised about the burdens of permitting, but also observed that "it may be that such permitting authority is *necessary to protect water quality*, and that the States or EPA could control regulatory costs by issuing general permits to point sources associated with water distribution programs." 541 U.S. at 108 (emphasis added). Indeed, recognizing the importance of safeguarding drinking water, Congress created an extensive system to protect this precious resource, a system that would be undermined by exempting interbasin water transfers.

Hence, the Supreme Court's decisions in *Miccosukee* and *Los Angeles County* support the conclusion that water transfers between two distinct water bodies are not exempt from the Act.

III

In my view, then, Congress has "unambiguously expressed" its intent to subject interbasin water transfers to the requirements of §§ 1311 and

32

1362 of the Act. Accordingly, I would affirm the judgment of the district court based on step one of *Chevron*. Even assuming, however, that the statutory text is ambiguous, I agree with the district court that the Water Transfers Rule also fails at *Chevron* step two because it is an unreasonable and manifestly contrary interpretation of the Act, largely for the reasons set forth in the district court's thorough and carefully-reasoned decision. I add the following:

First, *Chevron* deference has its limits. "Deference does not mean acquiescence," *Presley v. Etowah County Comm'n*, 502 U.S. 491, 508 (1992), and "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking," *Judulang v. Holder*, 132 S. Ct. 476, 484-85 (2011).

Second, an agency's interpretation of an ambiguous statute is not entitled to deference where the interpretation is "at odds" with the statute's "manifest purpose," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 487 (2001), or the agency's actions "'deviate from or ignore the ascertainable legislative intent,'" *Chem. Mfrs. Ass'n v. EPA*, 217 F.3d 861, 867 (D.C. Cir. 2000) (quoting *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 520 (D.C. Cir. 1983)). *See* Katzmann, *Judging Statutes* 31 ("The task of the judge is to make sense of

legislation in a way that is faithful to Congress's purposes.  When the text is ambiguous, a court is to provide the meaning that the legislature intended.  In that circumstance, the judge gleans the purpose and policy underlying the legislation and deduces the outcome most consistent with those purposes.").  As discussed above, in my view the Water Transfers Rule is manifestly at odds with Congress's clear intent in passing the Act.

Third, the Water Transfers Rule is not entitled to deference because it will lead to absurd results.  *See Michigan v. EPA*, 135 S. Ct. 2699, 2707 (2015) ("No regulation is 'appropriate' if it does significantly more harm than good.'");  *see also* Scalia & Garner, *Reading Law* 234 ("A provision may be either disregarded or judicially corrected as an error (when the correction is textually simple) if failing to do so would result in a disposition that no reasonable person could approve.").  Indeed, this Court has already held -- twice -- that the "unitary waters" theory would lead to absurd results.  In *Catskill* I, we concluded that "[n]o one can *reasonably* argue that the water in the Reservoir and the Esopus are in any sense the 'same,' such that 'addition' of one to the other is a logical impossibility."  273 F.3d at 492 (emphasis added).  In *Catskill II*, we rejected the "unitary water" theory for a second time, observing that it "would lead to the

*absurd* result that the transfer of water from a heavily polluted, even toxic, water body to one that was pristine via a point source would not constitute an 'addition' of pollutants."  451 F.3d at 81 (emphasis added).  It would be an absurd result indeed for the Act to be read to allow the unlimited transfer of polluted water to clean water.  Clean drinking water is a precious resource, and Congress painstakingly created an elaborate permitting system to protect it.  Deference has its limits; I would not defer to an agency interpretation that threatens to undermine that entire system.

* * *

I would affirm the judgment of the district court, and, accordingly, I dissent.